## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| Higher Ground Education, Inc., *et al.*,[1] | § § | Case No.: 25-80121-11 (MVL) |
| Debtor. | § § § | (Joint Administration Requested) |

## DECLARATION OF JONATHAN MCCARTHY
## IN SUPPORT OF FIRST DAY MOTIONS

I, Jonathan McCarthy, hereby declare under penalty of perjury:

1. I am the Interim President and Secretary of the debtor and debtor in possession Higher Ground Education, Inc. ("**HGE**" together with its affiliates, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"). I was appointed to my role by the sole independent board member of the HGE Board of Directors (the "**Board**"), Marc D. Kirshbaum ("**Kirshbaum**" or the "**Independent Director**") following the resignation of the Debtors' officers. Prior to this role, I served, and continue to serve, as a director on the Board and have been an HGE director since September 2020.

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal identification number, are: Higher Ground Education Inc. (7265); Guidepost A LLC (8540); Prepared Montessorian LLC (6181); Terra Firma Services LLC (6999); Guidepost Birmingham LLC (2397); Guidepost Bradley Hills LLC (2058); Guidepost Branchburg LLC (0494); Guidepost Carmel LLC (4060); Guidepost FIC B LLC (8609); Guidepost FIC C LLC (1518); Guidepost Goodyear LLC (1363); Guidepost Las Colinas LLC (9767); Guidepost Leawood LLC (3453); Guidepost Muirfield Village LLC (1889); Guidepost Richardson LLC (7111); Guidepost South Riding LLC (2403); Guidepost St Robert LLC (5136); Guidepost The Woodlands LLC (6101); Guidepost Walled Lake LLC (9118); HGE FIC D LLC (6499); HGE FIC E LLC (0056); HGE FIC F LLC (8861); HGE FIC G LLC (5500); HGE FIC H LLC (8817); HGE FIC I LLC (1138); HGE FIC K LLC (8558); HGE FIC L LLC (2052); HGE FIC M LLC (8912); HGE FIC N LLC (6774); HGE FIC O LLC (4678); HGE FIC P LLC (1477); HGE FIC Q LLC (3122); HGE FIC R LLC (9661); LePort Emeryville LLC (7324); AltSchool II LLC (0403). The Debtors' mailing address is 1321 Upland Dr. PMB 20442, Houston, Texas 77043.

4936-2117-3325.7

2.　　　I am also the founder and managing partner of Venn Growth Partners ("**Venn**") a growth equity investor focused on partnering with distinctive education, health, and consumer companies in North America.  Venn, and certain of its affiliates, is an equity holder and debt holder in HGE.  Specifically, Venn owns approximately seven percent (7%) of HGE as a common stockholder, a Series B preferred stockholder, and a Series C preferred stockholder. Venn is also a creditor of HGE through different debt obligations owed by HGE to Venn.  Venn has also performed consulting services for the benefit of the Debtors in recent years.

3.　　　While I am a director of the Board at the appointment of Venn, my role as Interim President and Secretary of HGE is in my individual capacity and not as a representative for Venn.  I will serve the Debtors at the direction of the Independent Director and have abstained and will continue to abstain from any Board decisions that impact Venn and its affiliates.

4.　　　As the Debtors' Interim President and Secretary, I am responsible for, and am materially engaged with, the Debtors' operational and financial management including, among other things: (a) all restructuring activities and initiatives of the Debtors; (b) cash management and liquidity forecasting; (c) engagement with creditors and other stakeholders; and (d) providing contingency planning.

5.　　　I am responsible for overseeing the Debtors' restructuring efforts, including the progress of the Chapter 11 Cases, providing leadership to the Debtors' operations during the pendency of these Chapter 11 Cases, and, as necessary, assisting the Debtors' counsel, financial advisors, and other retained professionals throughout this process.

6.　　　I am over the age of 18, and I am authorized to submit this declaration on behalf of the Debtors.  References to the Bankruptcy Code (as defined herein), the chapter 11 process, and related legal matters are based on my understanding of such as explained to me by counsel,

Foley & Lardner LLP ("**Foley**").  Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge of the Debtors, their business operations, history, industry, books and records, and information supplied to me by other members of the Debtors' current employees, former employees performing work for the benefit of the debtors, the Debtors' advisors, and/or communications with the Debtors' investors and creditors.  If called as a witness, I could and would testify competently to the statements set forth in this Declaration on that basis, as the information in this Declaration is accurate and correct to the best of my knowledge, information, and belief.

7.      On June 17, 2025 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") with the U.S. Bankruptcy Court for the Northern District of Texas (the "**Court**"). To minimize adverse effects on the business and contemporaneously herewith, the Debtors have filed motions and pleadings seeking various types of immediate relief (collectively, the "**First Day Motions**"). The First Day Motions, as applicable, seek relief intended to avoid immediate and irreparable harm to the Debtors' estates and to preserve their value, by, among other things, providing the Debtors with access to necessary liquidity, including the use of cash collateral, and paying certain prepetition wages and administrative obligations to facilitate the Debtors' restructuring efforts.  The First Day Motions also seek certain procedural relief that will facilitate the Debtors' orderly transition into these Chapter 11 Cases.

8.      I submit this Declaration to assist the Court in understanding the circumstances that led to the filing of these Chapter 11 Cases and in support of the First Day Motions filed by the Debtors contemporaneously with their bankruptcy petitions.

9.      To assist the Court and parties in interest in understanding the Debtors' operations

and Schools, and the relief the Debtors are seeking in the First Day Motions, this Declaration is

organized as follows:

- *Part I* provides a preliminary statement

- *Part II* provides a background and general overview of the Debtors' history and
  operations of the Schools;

- *Part III* describes the Debtors' capital structure;

- *Part IV* provides an overview of significant events leading to the filing of these
  Chapter 11 Cases; and

- *Part V* discusses the Foreclosures and the Debtors' post-Foreclosure operations;

- *Part VI* provides a preview of these Chapter 11 Cases under the RSA; and

- *Part VII* discusses the First Day Motions.

### I. PRELIMINARY STATEMENT[2]

10.      The Debtors commence these Chapter 11 Cases with the broad support of all or

substantially all of the Debtors' major stakeholder groups.  Prior to the Petition Date, the Debtors

entered into a restructuring support agreement (the "**Restructuring Support Agreement**" or

the "**RSA**")[3] supported by, among others, (a) 2HR Learning, Inc. ("**2HR**"), an arms-length

investor which has agreed to act as plan sponsor and Senior DIP Lender; (b) Guidepost Global

Education, Inc. ("**GGE**"),[4] which has agreed to contribute certain of its assets pursuant to the

Plan and to act as the Junior DIP Lender; (c) Ramandeep (Ray) Girn ("**Mr. Girn**") the Debtors'

co-founder and former chief executive officer, and Rebecca Girn, the Debtors' co-founder and

---

[2]      Capitalized terms used but not otherwise defined in this Preliminary Statement have the meanings given to them elsewhere herein.

[3]      The Debtors will file the RSA and a motion to assume the RSA shortly after the Petition Date.

[4]      GGE is an affiliated entity of Learn Capital.

former general counsel ("**Ms. Girn**" and together with Mr. Girn, the "**Girns**"); (d) Yu Capital, LLC and its affiliated entities that represent a significant number of the Debtors' EB-5 Investors; and (e) the consenting parties thereto (with the other signatories to the RSA, the "**Supporting RSA Parties**").   The RSA follows significant diligence, discussions, and negotiations around a value-maximizing restructuring transaction through a pre-arranged joint chapter 11 plan (the "**Plan**"), which I believe will best position these Chapter 11 Cases to effectuate a value-maximizing result for all parties in interest.   Among other things, and as more fully described in the RSA, the RSA contemplates the broad support of the Plan that, despite the secured debt in the Debtors' capital structure, anticipates recoveries to unsecured creditors.

11.    Importantly, this restructuring contemplated by the RSA will, following multiple pre-petition foreclosures and negotiated sales of substantially all of the Debtors' ongoing operations (the "**Foreclosures**"), allow the Debtors to maximize value for parties in interest, keep the largest number of employees employed, and provide students and families with ongoing access to the Remaining Schools (as defined herein).   These Chapter 11 Cases are supported by up to $8 million of new money through a senior and junior post-petition financing facilities, which also includes a dollar-for-dollar roll-up of approximately $2 million of the pre-petition bridge financing from the lenders (the "**DIP Facilities**").   The DIP Facilities will provide the Debtors with sufficient liquidity to prosecute these Chapter 11 Cases, confirm and consummate the Plan, and support ongoing operations for the Debtors' remaining seven (7) Schools.   The RSA contemplates a case timeline that will effectuate the value-maximizing Plan by September 30, 2025.

12.    The RSA parties signed support these Chapter 11 Cases based on the belief that a reorganization of the Debtors' remaining business will continue the Debtors' mission of

providing the best early childhood education to students and families throughout the United States, whether utilizing the Debtors' current platform or modifying or supplementing that platform with new educational programing.  Without the RSA and the DIP Facilities, the Debtors would have been required to liquidate under a Chapter 7 bankruptcy – a disorganized process that would not maximize value for the Debtors' creditors.

## II.
## BACKGROUND

### A.    Overview of the Debtors

13.    HGE was founded in 2016 by a team of educators and business leaders, who had spent their early careers dedicated to creating and scaling LePort Education Inc., a high-quality, high-fidelity Montessori school network headquartered in Southern California.  Mr. Girn founded and led the Debtors as their President and Chief Executive Officer.  For many years the team devoted itself to developing, testing, refining, and putting into practice the resources, systems, infrastructure, and pedagogical leadership required to achieve Montessori "at scale," and created a network of schools across the United States.  HGE operated its Montessori schools under the Guidepost brand – a brand synonymous with cultivating independent children to "live a life, fully lived."

14.    The Debtors' mission was to modernize and mainstream the Montessori education movement.  In addition to owning and operating Montessori schools (the "**Schools**"), the Debtors provided accredited teacher training and licensed content to other Montessori schools.  In addition, in 2020, HGE acquired the Altitude platform, a learning management system that HGE believed could be used to operate Guidepost classrooms across the network.  Following rapid expansion as the U.S. emerged from COVID-19 lockdowns, the Debtors offered an end-to-end experience that covered the entire lifecycle of a family at school—virtually and at home—from

birth through secondary education, enabled by next-gen, accredited Montessori instruction and programming.

15.    Following the early success of the schools in the United States, HGE sought to expand its mission, dedication to education, and Montessori platform to China, Canada, and countries in Europe.  This foreign expansion began in 2019 through the opening of wholly owned schools (the "**Foreign Schools**") in Hong Kong and mainland China and the formation of strategic partnerships with parties that wanted to utilize HGE's brand, programming, and pedagogy.

16.    By the fall of 2024, the Debtors were the largest owner and operator of Montessori schools in the world with over 150 schools in operations and plans for the construction and opening of dozens more schools.  These schools were located across the United States, with locations in, among other states, Texas, North Carolina, California, New York, New Jersey, Illinois, Massachusetts, Washington, Maryland, Florida, Michigan, Alabama, Indiana, Ohio, Arizona, Kansas, Missouri, and Virginia.  In addition to its core campus network, the Debtors offered virtual school, home school and teacher training, and also licensed its content to independent school partners. However, and as discussed herein, the Debtors owned and operated seven (7) of the Schools as of the Petition Date and the Debtors and 2HR are discussing the future of those seven (7) Schools.

**B.    The Debtors' Corporate Structure and the Schools**

17.    The Debtors operated the Schools through various structures – all managed by centralized operations at HGE.  HGE is the ultimate corporate parent company of the Debtors. HGE owned, directly or indirectly, numerous Debtor and non-debtor subsidiaries that were utilized to operate and/or own the Debtors' Schools and accredited training programs.  As of the Petition Date, HGE owns and operates seven (7) Schools. For the convenience of the Court and

4936-2117-3325.7

all parties in interest, the Debtors' organizational structure and respective ownership percentage of the various Debtor and non-debtor subsidiaries is set forth in the chart attached hereto as **Exhibit A**.

18.     Specifically, the Debtors' primary business was owning and operating the Schools.  The Schools were either wholly owned by Guidepost A or were owned by other subsidiary entities (the "**School Subsidiaries**").  The School Subsidiaries were established to own, manage, and/or operate Schools in selected markets in the United States.  The School Subsidiaries are either wholly owned by Guidepost A or were majority-owned by Guidepost A with the minority owners consisting of limited interests owned by non-U.S. person investors ("**EB-5 Investors**") under the Employment Based Immigration Preference program, known as "EB-5" (the "**EB-5 Program**").  The Debtors' EB-5 Program is discussed herein in more detail.

19.     Further, the Debtors owned, operated, and managed their accredited training programs at Prepared Montessorian LLC ("**Prepared Montessorian**") and Prepared Montessorian TT LLC ("**Prepared TT**"),[5] Prepared Montessorian's former wholly owned subsidiary.  The Debtors were known for their pedagogy and innovative Montessori programming that was utilized by Montessori educators within and outside of the Schools.

20.     In furtherance of their mission, the Debtors offered two Montessori programs and brands: the Guidepost Montessori brand for children in their early years (generally infant through pre-kindergarten) and Guidepost Academy for children and young adolescents (generally grades kindergarten through eighth grade).  The Debtors' primary focus, however, was the early childhood education space.

---

[5]     Prepared TT is not a Debtor in these Chapter 11 Cases.

4936-2117-3325.7

21.     In 2016 and 2017, the Debtors started with a small number of Schools and at the

end of each calendar year, maintained the following number of Schools:

| Year Ending | Number of Schools |
|---|---|
| 2018 | 12 |
| 2019 | 27 |
| 2020 | 60 |
| 2021 | 81 |
| 2022 | 101 |
| 2023 | 132 |
| 2024 | 150 |
| Petition Date | 7 |

22.     The Debtors' growth and the funding to achieve such growth is discussed in more

detail herein.

### III.
### CAPITAL STRUCTURE

A.     **Funded Debt Structure**

23.     Prior to the Petition Date, the Debtors entered into various financing arrangements

to funds the Debtors' Schools and general operations.  As of the Petition Date and following the

Foreclosures (which are discussed in detail in Section V), the Debtors maintained the following

funded debt obligations:

| Debt | Approx. Amount Outstanding[6] |
|---|---|
| **Secured Funded Debt** | |
| Bridge CN-3 Notes | $4,800,000 |
| WTI Loan Agreements | $4,680,970 |
| CN Notes | $117,837,932 |
| **Total Secured Funded Debt** | **$127,318,902** |

---

[6]   The Approximate Amount Outstanding reflects the estimated amount outstanding as of the Petition Date
according to the Debtors' books and records.  These numbers are a summary and are not intended to reflect the
actual amounts outstanding as of the Petition Date.  The Debtors continue to reconcile their books and records
and reserve all rights as to the correct amounts of these funded debt obligations.

4936-2117-3325.7

| Debt | Approx. Amount Outstanding[6] |
|---|---|
| **Unsecured Funded Debt** | |
| Learn Fund XXXVII Promissory Note | $410,350 |
| NRTC Promissory Note | $289,833 |
| Yu FICB Promissory Notes | $1,182,387 |
| YuATI Promissory Notes | $2,200,000 |
| YuHGEA Loan Agreement | $57,424 |
| Yu Capital Loan | $327,858 |
| LFI Unsecured Notes | $12,454,566 |
| **Total Unsecured Funded Debt** | **$16,922,418** |
| **Total Funded Debt** | **$144,241,320** |

i.   **Secured WTI Loans**

24.    HGE, Guidepost A, Prepared Montessorian, Prepared TT, and Terra Firma Services LLC, ("**Terra Firma**," and with HGE, Guidepost A, Prepared Montessorian, and Prepared TT, the "**WTI Borrowers**") are parties to several prepetition financing arrangements with Venture Lending & Leasing IX, Inc., ("**Fund IX**") and WTI Fund X, Inc., ("**Fund X**" together with Fund IX, "**WTI**"). Specifically, WTI and the WTI Borrowers entered into (a) the Loan and Secured Agreement, dated February 19, 2021, by and between Fund IX and the Borrowers in the original principal amount of $12 million (as may have been amended, supplemented, restated, and modified from time to time, the "**Fund IX Loan Agreement**"); (b) that certain Loan and Security Agreement, dated as of November 8, 2023, between Fund X and the WTI Borrowers in the original principal amount of $15 million (as may have been amended, supplemented, restated, and modified from time to time, the "**Fund X Loan Agreement**," and with the Fund IX Loan Agreement, the "**WTI Loan Agreements**").

25.    To secure the WTI Borrowers' obligations under the WTI Loan Agreements, each Borrower granted to WTI a blanket security interests in substantially all of such WTI Borrowers'

personal property assets, including certain intellectual property owned by HGE and Terra Firma (collectively, the "**WTI Collateral**").  WTI's security interests in the WTI Collateral were perfected by: (a) a UCC-1 Financing Statement with the Delaware Department of State on February 22, 2021, as file number 20211409706; (b) a UCC-1 Financing Statement with the Delaware Department of State on November 8, 2023, as file number  20237621211; (c) a UCC-1 Financing Statement with the Delaware Department of State on May 10, 2024, as file number 20243148184; (d) that Intellectual Property Security Agreement, dated as of February 19, 2021, between HGE and Fund IX, with such recordation located at (i) Reel 055418 Frame 0170 covering the patents of HGE described therein and (ii) Reel 7226 Frame 0223 covering the trademarks of HGE described therein; (e) that certain Intellectual Property Security Agreement, dated as of February 19, 2021, between Terra Firma and Fund IX, with such recordation located at Reel 7226 Frame 0360 covering the trademark of Terra Firma described therein; (f) that certain Intellectual Property Security Agreement, dated as of November 8, 2023, between HGE and Fund X, with such recordation located at (i) Reel 065514 Frame 0203 covering the patent of HGE described therein and (ii) Reel 8254 Frame 0751 covering the trademarks of HGE described therein; and (g) that certain Intellectual Property Security Agreement, dated as of November 8, 2023, between Terra Firma and Fund X, with such recordation located at Reel 8254 Frame 0780 covering the trademark of Terra Firma.

26.    As such, Fund IX and Fund X were secured by substantially all of the property of the WTI Borrowers, subject to certain perfected security interests in specific assets held by other secured creditors. Pursuant to that Intercreditor Agreement, dated November 8, 2023, between Fund IX and Fund X, the parties agreed that the liens of Fund IX and Fund X shall be of equal

rank and priority and all of the rights, interests, and obligations under the WTI Loan Agreements and related loan documents shall be shared by Fund IX and Fund X pro rata.

27.    As of the Petition Date and following the Foreclosures, WTI maintains a perfected, secured claim against the WTI Borrowers in the approximate amount of $4,680,970 (due to the fact that WTI did not foreclose on all of the WTI Collateral), broken out as follows:

| Loan Agreement | Approximate Amount Outstanding |
|---|---|
| Fund IX Loan Agreement | $153,801 |
| Fund X Loan Agreement | $4,527.169 |
| **Total** | **$4,680,970** |

### ii.    Secured CN Notes

28.    To further fund the Debtors' Schools and business operations, the Debtors entered into that Note Purchase Notice and Note Purchase Agreement, dated May 31, 2024 (as may have been amended, supplemented, restated, and modified from time to time, the "**NPA**") whereby the Debtors were authorized to issue and sell one or more promissory notes in a first series (the "**CN-1 Notes**"), one or more promissory notes in a second series (the "**CN-2 Notes**"), and one or more promissory notes in a third series (the "**CN-3 Notes**," and with the CN-1 Notes and the CN-2 Notes, the "**CN Notes**").  The CN Notes are secured by a blanket lien on all HGE assets (the "**CN Notes Collateral**") pursuant to the Security Agreement, dated May 31, 2024 between HGE and Learn Capital Venture Partners IV, L.P., the Collateral Agent for all notes issued under the NPA (the "**NPA Collateral Agent**"), and any security interests in the CN Notes Collateral (other than as expressly provided for the Bridge CN-3 Notes (as defined below)) are expressly subordinated to WTI's liens in the CN Notes Collateral.  The NPA Collateral Agent perfected the CN Notes security interest in the CN Notes Collateral pursuant to that UCC-1

Financing Statement with the Delaware Department of State on May 31, 2024, as file number 20243664982.

29.    Upon an event of repayment of the CN Notes, the NPA provides that holders of the CN-3 Notes are entitled to receive a recovery in full before any payment may be made to holders of the CN-2 Notes and CN-1 Notes.  Once all holders CN-3 Notes have been repaid in full, holders of CN-2 Notes are then entity to receive a recovery in full before any payment may be made to holders of CN-1 Notes.

30.    Pursuant to the NPA, the CN Notes convert into Conversion Shares[7] upon the first to occur of (a) the consent of the Majority Note Holders[8] or (b) the date that is four months following the date of the Initial Closing (provided, that (i) such date may be extended two times by up to three months each and/or (ii) such conversion may be waived entirely, in each case, with the consent and at the sole discretion of the Majority Note Holders).  Learn Capital, and its affiliated entities, are the Majority Note Holders for the CN Notes and have waived any conversion of the CN Notes into the Conversion Shares.

31.    As of the Petition Date, there is approximately $43,014,365 in CN-3 Notes, $41,304,320, in CN-2 Notes, and $33,566,465 in CN-1 Notes outstanding, held by the following holders:

| Lender | Class | Approximate Principal Amount |
|---|---|---|
| Learn Capital Venture Partners III, L.P., on its own behalf and as nominee for Learn Capital Venture Partners IIIA, L.P. | CN-1 Note | $1,525,938 |

---

[7]    "Conversion Shares" means (i) with respect to the CN-1 Notes, the Series E-1 Preferred Stock, (ii) with respect to the CN-2 Notes, the Series E-2 Preferred Stock, and (iii) with respect to the CN-3 Notes, the Series E-3 Preferred Stock

[8]    "Majority Note Holders" means the holders of  majority in interest of the aggregate principal amount of the CN Notes then outstanding.

| Lender | Class | Approximate Principal Amount |
|---|---|---|
| Learn Capital Venture Partners IV, L.P., on its own and as nominee for Learn Capital Venture Partners IV-US, L.P. | CN-1 Note | $1,333,141[9] |
| Learn Capital Fund V Growth, L.P. | CN-1 Note | $2,055,391[10] |
| Previously Existing Convertible Notes | CN-1 Notes | $28,651,995[11] |
| Learn Capital Venture Partners III, L.P., on its own behalf and as nominee for Learn Capital Venture Partners IIIA, L.P. | CN-2 Note | $6,094,549[12] |
| Learn Capital Fund V Growth, L.P. | CN-2 Note | $30,186,659[13] |

[9]   This amount consists of the reclassification of that certain Subordinated Unsecured Promissory, dated February 22, 2023, between Learn Capital Venture Partners III, L.P. and HGE in the amount of $1,333,141.27.

[10]   This amount consists of the reclassification of (a) that certain Subordinated Unsecured Promissory, dated December 5, 2022, between Learn Capital Fund V Growth, L.P. and HGE in the amount of $1,029,898.03 and (b) that certain Subordinated Unsecured Promissory, dated February 22, 2023, between Learn Capital Fund V Growth, L.P. and HGE in the amount of $1,025,493.29.

[11]   Pursuant to the Closing Conditions to Note Purchase Agreement and Series E Financing, dated June 13, 2024 (the "**Closing Conditions Agreement**"), "all existing convertible notes outstanding … will be cancelled, exchanged or amended to CN-1 Notes…"  At the time of the Closing Conditions Agreement, there were approximately fifty-seven (57) convertible notes outstanding, which were converted into the CN-1 Notes. Many of these notes were not issued new CN-1 Notes and the Debtors tracked and recognized such notes as CN-1 Notes.

[12]   This amount consists of the reclassification of: (a) $1,018,064.98 from a Subordinated Unsecured Promissory, dated July 6, 2023, between Learn Capital Venture Partners III, L.P. and HGE; (b) $3,048,897.08 from a Subordinated Unsecured Promissory, dated August 7, 2023, between Learn Capital Venture Partners III, L.P. and HE; (c) $1,014,591.18 from a Subordinated Unsecured Promissory, dated September 7, 2023, between Learn Capital Venture Partners III, L.P. and HGE; and (d) $1,012,996.12 from a Subordinated Unsecured Promissory, dated October 6, 2023, between Learn Capital Venture Partners III, L.P. and HGE.

[13]   Of this amount, $5,320,868.44 will be credited toward the satisfaction of the Pro Rata Share of Learn Capital Venture Partners IV, L.P.  Further, this amount consists of the: (a) that certain Subordinated Unsecured Promissory, dated November 18, 2022, between Learn Capital Fund V Growth, L.P. and HGE in the amount of $4,123,393.44; (b) that certain Subordinated Unsecured Promissory, dated December 21, 2022, between Learn Capital Fund V Growth, L.P. and HGE in the amount of $4,116,017.62; (c) that certain Subordinated Unsecured Promissory, dated January 23, 2023, between Learn Capital Fund V Growth, L.P. and HGE in the amount of $3,595,073.13; (d) that certain Subordinated Unsecured Promissory, dated January 30, 2023, between Learn Capital Fund V Growth, L.P. and HGE in the amount of $513,386.87; (e) that certain Subordinated Unsecured Promissory, dated March 8, 2023, between Learn Capital Fund V Growth, L.P. and HGE in the amount of $1,332,129.06; (f) that certain Subordinated Unsecured Promissory, dated March 22, 2023, between Learn Capital Fund V Growth, L.P. and HGE in the amount of $4,812,502.19; (g) that certain Subordinated Unsecured Promissory, dated May 23, 2023, between Learn Capital Venture Partners IV, L.P. and HGE in the amount of $1,020,498.17; (h) that certain Subordinated Unsecured Promissory, dated May 30, 2023, between Learn Capital Venture Partners IV, L.P. and HGE in the amount of $1,020,110.68; (i) that certain Subordinated Unsecured Promissory, dated June 21, 2023, between Learn Capital Venture Partners IV, L.P. and HGE in the amount of $3,566,128.38; (j) that certain Subordinated Unsecured Promissory, dated June 29, 2023, between Learn Capital Fund V Growth, L.P. and HGE in the amount of $1,018,451.69; (k) that certain Subordinated Unsecured Promissory, dated September 7, 2023, between Learn Capital Fund V Growth, L.P. and HGE in the amount of $2,536,477.96; and (l) that certain Subordinated Unsecured Promissory, dated October 6, 2023, between Learn Capital Fund V Growth, L.P. and HGE in the amount of $2,532,490.31.

| Lender | Class | Approximate Principal Amount |
|---|---|---|
| Learn Capital Venture Partners IV, L.P., on its own and as nominee for Learn Capital Venture Partners IV-US, L.P. | CN-2 Note | $5,023,111[14] |
| Learn Capital Venture Partners III, L.P., on its own behalf and as nominee for Learn Capital Venture Partners IIIA, L.P. | CN-3 Note | $2,000,000 |
| Learn Capital IV Special Opportunities XI, LLC | CN-3 Note | $18,536,514[15] |
| Venn Growth Partners HGE LP | CN-3 Note | $1,000,000 |
| Branch Hill Capital, LLC | CN-3 Note | $430,020 |
| Nimble Ventures, LLC | CN-3 Note | $531,040 |
| Venn Growth GP Limited | CN-3 Note | $4,197,523[16] |
| Ramandeep Girn | CN-3 Note | $3,069,031[17] |
| Learn Capital Special Opportunities Fund XVIII, L.P. | CN-3 Note | $5,300,000 |
| HEAL Partners International Fund 1 LP | CN-3 Note | $380,503 |
| HEAL Partners Australia Fund 1 | CN-3 Note | $1,619,417 |
| 2HR Learning, Inc. | CN-3 Note | $5,000,000 |
| Ramandeep Girn | CN-3 Note | $903,100[18] |
| **Total Approximate Principal Amount** | | **$117,837,932** |

---

[14] This amount consists of the reclassification of that certain Subordinated Unsecured Promissory, dated March 7, 2024, between Learn Capital Venture Partners IV, L.P. and HGE in the amount of $5,023,111.10.

[15] Certain of this amount consists of a reclassification of: (a) that certain Subordinated Unsecured Promissory, dated April 2, 2024, between Learn Capital IV Special Opportunities XI, LLC and HGE in the amount of $1,003,206.10; (b) that certain Subordinated Unsecured Promissory, dated April 2, 2024, between Learn Capital IV Special Opportunities XI, LLC and HGE in the amount of $5,016,030.51; (c) that certain Subordinated Unsecured Promissory, dated April 8, 2024, between Learn Capital IV Special Opportunities XI, LLC and HGE in the amount of $6,017,277.53; and (d) that certain Loan Agreement & Promissory Note, dated June 7, 2024, between Learn Capital IV Special Opportunities XI, LLC and HGE in the amount of $4,000,000.

[16] Certain of this amount consists of the reclassification of that certain Loan Agreement and Promissory Note, dated June 10, 2024 between Venn Growth GP Limited and HGE in the amount of $750,000.

[17] This amount consists of the reclassification of that certain Note Redemption Agreement dated June 11, 2024 between Guidepost A, Ramandeep Singh Girn, and Rebecca Knapp Girn, and that certain promissory note dated June 30, 2024, issued to Ramandeep Singh Girn in the amount of $3,036,031.53.

[18] This CN-3 Note was issued to Mr. Girn on February 2, 2025 and is the reclassification of that certain unsecured Loan Agreement & Promissory Note, dated June 30, 2024, between Ramandeep Girn and Guidepost A LLC in the amount of $903,100.69 into a secured CN-3 Note.

4936-2117-3325.7

### iii.   <u>Secured Bridge CN-3 Loans</u>

32.     Beginning on and after January 15, 2025, the Debtors and certain lenders entered into the series CN-3 convertible promissory notes (the "**Bridge CN-3 Notes**") in the aggregate principal amount of $4,800,000 (the "**Bridge CN-3 Loans**"), plus interest, fees and costs, **and** including any premiums, expenses, indemnity, and reimbursement obligations accrued thereunder and all other fees and expenses (including fees and expenses of attorneys and advisors) as provided therein, issued pursuant to the NPA.   The Bridge CN-3 Notes are collateralized by a priming lien over the WTI Loan Agreements in the principal amount of up to $5,000,000, in favor of the NPA Collateral Agent.   WTI consented to this treatment pursuant to that Closing Conditions to Note Purchase Agreement and Series E Financing #2, effective February 5, 2025, between HGE, WTI, Learn Capital, Learn Capital Special Opportunities Fund XXXVII, LLC, and 2HR Learning, Inc.

33.     As of the Petition Date, $4,800,000 of Bridge CN-3 Notes remained outstanding and are broken out by the Lenders, as follows:

| Lender | Amount |
|---|---|
| Ramandeep Girn | $500,000 |
| Learn Capital Venture Partners III, L.P. | $2,300,000 |
| 2HR Learning, Inc. | $1,000,000 |
| Learn Capital IV Special Opportunities X, LLC | $1,000,000 |
| **Total** | **$4,800,000** |

### iv.   <u>Unsecured Learn Capital Debt</u>

34.     Learn Capital Special Opportunities Fund XXXVII LLC ("**Learn Fund XXXVII**") and HGE, Guidepost FIC A LLC, Guidepost FIC B LLC, Guidepost FIC C LLC, HGE FIC D LLC, HGE FIC E LLC, HGE F LLC, HGE FIC G LLC, HGE FIC I

LLC, HGE FIC L LLC, HGE FIC M LLC, HGE FIC N LLC, Guidepost The Woodlands LLC, Guidepost Goodyear LLC, and LePort Emeryville LLC, as debtors (collectively, the "**Learn Borrowers**") are party to that Second Amended and Restated Secured Convertible Promissory Note, dated March 13, 2025 (as the same has been amended, supplemented, restated and otherwise modified from time to time, the "**Learn Fund XXXVII Promissory Note**"), in the original principal amount of $3,800,000.00.   The Learn Fund XXXVII Promissory Note is secured by that Second Amended and Restated Security Agreement, dated March 13, 2025, between Learn Fund XXXVII and the Learn Borrowers. Prior to foreclosure, the Learn Fund XXXVII Promissory Note was secured, up to the secured amount for each School set forth in the Learn Fund XXXVII Promissory Note, by a first lien security interest in substantially all of the assets of the following Schools (the "**Learn Fund XXXVII Collateral**"):

| Borrower | School | Secured Amount |
|---|---|---|
| Guidepost FIC A LLC | Guidepost Montessori at Spruce Tree | $130,000 |
| Guidepost FIC B LLC | Guidepost Montessori at Timber Ridge | $80,000 |
| Guidepost FIC B LLC | Guidepost Montessori at Wicker Park | $20,000 |
| Guidepost FIC B LLC | Guidepost Montessori at Foothill Ranch | $20,000 |
| Guidepost FIC C LLC | Guidepost Montessori at Copper Hill | $20,000 |
| Guidepost Goodyear LLC | Guidepost Montessori at Goodyear | $20,000 |
| Guidepost The Woodlands LLC | Guidepost Montessori at The Woodlands | $20,000 |
| HGE FIC D LLC | Guidepost Montessori at Flower Mound | $20,000 |
| HGE FIC D LLC | Guidepost Montessori at Magnificent Mile | $70,000 |
| HGE FIC E LLC | Guidepost Montessori at Hollywood Beach | $20,000 |
| HGE FIC E LLC | Guidepost Montessori at Peoria | $2,400,000 |
| HGE FIC F LLC | Guidepost Montessori at Plum Canyon | $20,000 |
| HGE FIC G LLC | Guidepost Montessori at Laurel Oak | $30,000 |
| HGE FIC G LLC | Guidepost Montessori at Mahwah | $30,000 |
| HGE FIC I LLC | Guidepost Montessori at Burr Ridge | $20,000 |
| HGE FIC I LLC | Guidepost Montessori at Deerbrook | $70,000 |

| Borrower | School | Secured Amount |
|---|---|---|
| HGE FIC I LLC | Guidepost Montessori at Downtown Naperville | $20,000 |
| HGE FIC I LLC | Guidepost Montessori at Evanston | $70,000 |
| HGE FIC I LLC | Guidepost Montessori at Hollywood Beach East | $20,000 |
| HGE FIC I LLC | Guidepost Montessori at Palm Beach Gardens | $70,000 |
| HGE FIC I LLC | Guidepost Montessori at Baymeadows | $20,000 |
| HGE FIC L LLC | Guidepost Montessori at Kendall Park | $20,000 |
| HGE FIC L LLC | Guidepost Montessori at Paradise Valley | $30,000 |
| HGE FIC L LLC | Guidepost Montessori at Downtown Boston | $20,000 |
| HGE FIC L LLC | Guidepost Montessori at Legacy | $20,000 |
| HGE FIC L LLC | Guidepost Montessori at Old Town | $30,000 |
| HGE FIC L LLC | Guidepost Montessori at Princeton Meadows | $20,000 |
| HGE FIC L LLC | Guidepost Montessori at Lynnwood | $30,000 |
| HGE FIC L LLC | Guidepost Montessori at San Rafael | $20,000 |
| HGE FIC M LLC | Guidepost Montessori at Downers Grove | $20,000 |
| HGE FIC M LLC | Guidepost Montessori at Leavenworth | $20,000 |
| HGE FIC M LLC | Guidepost Montessori at Celebration Park | $20,000 |
| HGE FIC N LLC | Guidepost Montessori at Kent | $20,000 |
| HGE FIC N LLC | Guidepost Montessori at North Wales | $20,000 |
| LePort Emeryville LLC | Guidepost Montessori at Emeryville | $320,000 |

35.     Learn Fund XXXVII's security interests in the Learn Fund XXXVII Collateral were perfected by UCC-1 Financing Statements filed with the Delaware Department of State on March 6, 2025, as File Numbers: 20251574091, 20251573606, 20251573259, 20251574182, 20251573929, 20251573663, 20251572954, 20251573861, 20251574505, 20251573655, 20251573317, 20251573093, and 20251574174 (as amended on March 17, 2025 by Amendment No. 20251830410).  As of the Petition Date, approximately $419,351 remains outstanding under the Learn Fund XXXVII Promissory Note, which the Debtors consider unsecured due to either the Foreclosures or subsequent sale of the Learn Fund XXXVII Collateral.

v.   **Yu Capital Loans**

36.    Yu Capital, LLC ("**Yu Capital**") and its affiliates entered into a number of project specific loans with the Debtors that were secured by specific assets, which Yu Capital or its affiliates foreclosed upon.  *See* Section V.  As such, the Debtors consider all of the loans between the Debtors and Yu Capital and its affiliates to be unsecured.

a.    **YuHGE A Loan**

37.    Guidepost A and YuHGE A LLC ("**YuHGE A**") are party to that Amended and Restated Loan Agreement, dated March 22, 2018, in the original principal amount of $1,000,000 (as amended and supplemented from time to time, the "**YuHGE A Loan**"), secured by that Pledge and Security Agreement between Guidepost A and YuHGE A, and guaranteed by HGE. The YuHGE A Loan was secured by a first priority security interest in Guidepost A's 92.5% equity interest in Guidepost FIC A LLC, an owner of two Schools – Prosperity and Spruce Tree (the "**YuHGE A Collateral**").   YuHGE A perfected its security interest in the YuHGE A Collateral pursuant to that UCC-1 Financing Statement with the Delaware Department of State on February 29, 2024 (as amended on March 27, 2025), as file number 20241354040.  As of the Petition Date, approximately $57,425 remains outstanding on the YuHGE A Loan, which the Debtors consider to be unsecured due to the foreclosure of the YuHGE A Collateral.

b.    **YuATI Loan**

38.    Guidepost A and YuATI LLC ("**YuATI**") are party to that Secured Promissory Notes in the aggregate principal amount of $2,200,000 (the "**YuATI Loan**"), secured by that Pledge and Security Agreement Guidepost A and YuATI.  The YuATI Loan was secured by a first priority security interest in the Academy of Thought and Industry – San Francisco Campus and the Academy of Thought and Industry – Austin Campus (the "**YuATI Collateral**").  YuATI perfected its security interest in the YuATI Collateral pursuant to that UCC-1 Financing

Statement with the Delaware Department of State on February 29, 2024, as file number 20241354321.

39.     Both Schools that are the YuATI Collateral were closed well before the Petition Date.  As such, the Debtors consider the YuATI Loan unsecured.  As of the Petition Date, at least $2,200,000 remains outstanding on the YuATI Loan.

        c.     **YuFIC B Loan**

40.     Guidepost A and YuFIC B, LLC ("**YuFIC B**") are party to that Secured Promissory Note, dated December 5, 2021, in the original principal amount of $2,000,000 (the "**YuFIC B Loan**"), secured by that Pledge and Security Agreement Guidepost A and YuFIC B.  The YuFIC B Loan was secured by a first priority security interest in the Eldorado School (the "**YuFIC B Collateral**").  YuFIC B perfected its security interest in the YuFIC B Collateral pursuant to that UCC-1 Financing Statement with the Delaware Department of State on February 29, 2024, as file number 20241354180.  As of the Petition Date, approximately $1,182,387 remains outstanding on the YuFIC B Loan, which the Debtors consider to be unsecured due to the foreclosure of the YuFIC B Collateral.

        d.     **NRTC Loan**

41.     Guidepost A and NTRC Equity Partners, LLC ("**NTRC**") are party to that Secured Promissory Note, dated July 17, 2023, in the original principal amount of $4,000,000 (the "**NTRC Loan**"), secured by that Pledge and Security Agreement Guidepost A and NTRC. The NTRC Loan was secured by a first priority security interest in the Bee Cave School, the Brushy Creek School, the Round Rock School, and the Westlake School (the "**NRTC Collateral**").  NRTC perfected its security interest in the NRTC Collateral pursuant to that UCC-1 Financing Statement with the Delaware Department of State on February 29, 2024, as file number 20241354305.  As of the Petition Date, approximately $289,833 remains outstanding

on the NRTC Loan, which the Debtors consider to be unsecured due to the foreclosure of the NRTC Collateral.

### e.     Yu Capital Loan

42.     Guidepost A and Yu Capital are party to that Secured Promissory Note, dated January 3, 2025, in the original principal amount of $441,913 (the "**Yu Capital Loan**"), secured by that Pledge and Security Agreement between Guidepost A and Yu Capital, and guaranteed by HGE.  The Yu Capital Loan was secured by a security interest in the NTRC Collateral and the YuFIC B Collateral (the "**Yu Capital Collateral**").  Yu Capital perfected its security interest in the Yu Capital Collateral pursuant to that UCC-1 Financing Statement with the Delaware Department of State on January 8, 2025, as file number 20250130077.  As of the Petition Date, approximately $327,858.63 remains outstanding on the Yu Capital Loan, which the Debtors consider to be unsecured due to the fact that the Yu Capital Collateral was foreclosed upon.

### vi.   Unsecured LFI Notes

43.     Guidepost A and Guidepost Financial Partner, LLC ("**LFI**") entered into certain unsecured promissory notes (as the same has been amended, supplemented, restated and otherwise modified from time to time, the "**LFI Notes**").  As of the Petition Date, there is approximately $12,454,566 outstanding under the LFI Notes.  The LFI Notes are unsecured loans that were utilized by Guidepost A to fund the startup costs and rental security deposits for certain Schools (the "**LFI Schools**").[19]  Pursuant to the LFI Notes, if the LFI Schools achieved a certain level of profitability, then Guidepost A was required to pay a percentage of such profits to LFI (the "**LFI Profit Share**").  As of the Petition Date, the Debtors only made limited LFI Profit Share payments to LFI.

---

[19]   The "LFI Schools" consist of the following Schools: Katy, Parker, Schaumburg, Evanston, Briarwood (Deerbrook), Edgewater, Champlin, and Downers Grove.

4936-2117-3325.7

44.     As of the Petition Date, there is approximately $12.4 million outstanding under the LFI Notes.

**B.     HGE Equity Structure**

45.     The Debtors have also utilized several classes of equity as sources of cash flow to fund operations.

### a.     Common Stock

46.     HGE is authorized to issue 90 million shares of common stock at $0.00001 par value per share, consisting of 80 million shares of Class A common stock ("**Class A**") and 10,000,000 shares of Class B common stock ("**Class B**").[20]   As of the Petition Date, there are approximately 22,980,559 Class A shares and 10,000,000 Class B shares issued and outstanding.

### b.     Preferred Stock

47.     HGE is authorized to issue 9 million shares of Series Seed Preferred Stock ("**Series Seed**"), 12 million shares of Series B Preferred Stock ("**Series B**"), 15 million shares of Series C Preferred Stock ("**Series C**"), and 12 million shares of Series D Preferred Stock ("**Series D**").   All classes of preferred stock have a par value of $0.00001.   As of the Petition Date, there are approximately 8,671,641 Series Seed, 3,830,656 Series B, 10,601,355 Series C, and 8,781,030 Series D shares issued and outstanding

### c.     Common Stock and Preferred Stock Rights

48.     Each holder of a Class A share is entitled to one vote on all matters subject to vote and each holder of a Class B share is entitled to ten votes on each matter subject to vote. Dividends are at the discretion of the Board but may not be declared without both Class A and Class B sharing in the dividend equally.   Each share of Class B, at the option of the holder, may at any time be converted into one fully paid and nonassessable share of Class A.

---

[20]   Learn Capital, Mr. Girn, and Venn own more than five percent (5%) of the equity in HGE.

49.     With the exception of dividends on shares of Class A common stock payable in shares of Class A common stock, no dividends can be declared to the common stockholders without the holders of preferred stock sharing equally in the dividend.  Each holder of outstanding shares of preferred stock is entitled to cast the number of votes equal to the number of whole shares of Class A common stock into which the shares of preferred stock held by such holder are convertible as of the record date.  In general, preferred stockholders vote together with the holders of common stock as a single class on an as-converted basis.

50.     Each share of preferred shares may be converted, at the option of a majority interest in such series without the payment of additional considerations, into the number of fully paid and nonassessable shares of common Class A as is determined by dividing the original issue price for such series of preferred stock by the conversion price in effect the time of conversion. Original issue price means $0.06 per share for the Series Seed, $2.566879 per share for Series B, $2.8606 for Series C, and $4.275758 for Series D.  Conversion price is the original issue price pertaining to such series of preferred stock. The conversion rate is subject to adjustments to reflect stock dividends, stock splits, and other events.  Further, preferred stock shares are not subject to redemption from HGE.

51.     For distributions of assets upon liquidation, each series of preferred shares have a 2x liquidation preference and rank senior to Class A and Class B common shares.  Dividends and distributions of assets upon liquidation will be paid to preferred shareholders based on the conversion formula as if the holder's shares had been converted into Class A common stock.

## C.     Subsidiary Equity Structure

52.     As mentioned above, the School Subsidiaries are either wholly owned by Guidepost A or majority-owned by Guidepost A with the minority owners consisting of the EB-5

Investors.  Regardless of ownership structure, HGE was the named "Manager" for each of the School Subsidiaries with broad power and authority.

53.     Pursuant to the EB-5 Program, EB-5 Investors may be able to gain permanent residence in the United States by investing the required minimum amount of capital in a domestic commercial enterprise that will create a specified minimum number of full-time jobs.[21] The Debtors' EB-5 Program was related to the opening of specific Schools and the job creation coming from those Schools.  Through the EB-5 Program and from 2017 to the Petition Date, the Debtors raised approximately $50 million from EB-5 Investors, with the proceeds are being used for general purposes.

54.     The Debtors' EB-5 Program is generally split into two distinct groups: (a) EB-5 Investors that designated Yu Capital as their representative and "Associate Manager" (the "**Yu Capital EB-5 Investors**") for those EB-5 School Subsidiaries and (b) EB-5 Investors that designated EB5AN Affiliate Network, LLC ("**EB5AN**") as their representative and "Special Manager" (the "**EB5AN EB-5 Investors**") for those EB-5 School Subsidiaries.[22]  Yu Capital EB-5 Investors maintained a Series B membership interest in their respective EB-5 School Subsidiaries and EB5AN EB-5 Investors maintained a Class B membership interest in their respective EB-5 School Subsidiaries (collectively, the "**Limited EB-5 Interests**").  The Limited EB-5 Interests provided for limited management and consent rights with respect to the operations

---

[21]   In particular, the following Debtor entities utilized EB-5 Investors:  Guidepost FIC B LLC; Guidepost FIC C LLC; HGE FIC D LLC; HGE FIC E LLC; HGE FIC F LLC; HGE FIC G LLC; HGE FIC I LLC; HGE FIC L LLC; HGE FIC M LLC; HGE FIC N LLC; HGE FIC O LLC; HGE FIC P LLC; HGE FIC Q LLC; Guidepost Birmingham LLC; Guidepost Carmel LLC; Guidepost Goodyear LLC; Guidepost Las Colinas LLC; Guidepost Muirfield Village LLC; Guidepost Richardson LLC; Guidepost St Robert LLC; Guidepost The Woodlands LLC; Guidepost Walled Lake LLC; and LePort Emeryville LLC (collectively, the "**EB-5 School Subsidiaries**").

[22]   LePort Emeryville LLC also contains EB-5 Investors but such EB-5 Investors do not designate an associate/special manager and do not have any rights requiring their consent to file LePort Emeryville LLC's Chapter 11 Case.

of the EB-5 School Subsidiaries.  The Limited EB-5 Interests did, however, provide for a
liquidation preference to the Limited EB-5 Interests compared to that of Guidepost A's
ownership interests.

55.     All required consents to file the EB-5 School Subsidiaries were obtained prior to
filing these Chapter 11 Cases.

## IV.
## SIGNIFICANT PREPETITION EVENTS

56.     As noted throughout this Declaration, various factors led to the commencement of
these Chapter 11 Cases.  Simply put, the Debtors have been unable to maintain and generate
sufficient liquidity to fund operations.  Since 2020, the Debtors have raised over $335 million in
funding through various debt and equity instruments, including EB-5 capital and lease
incentives.  The Debtors utilized these proceeds for the expansion and opening of the Debtors'
Schools, development of their educational platform, and the maintenance of the same.

57.     As reflected in the Debtors' financial statements, the Debtors' business has never
had positive cash flows from operations – resulting in the continuous need for external funding.
In the past year, following a period of significant operational challenges and underperformance
relative to budget, the Debtors had very limited sources of external funding.  As such, recent
cash fundings were from either multiple short-term financing arrangements or the sale of certain
School assets.

58.     Indeed, as the various efforts to raise third-party capital (or complete the sale of
company assets) did not achieve the desired results, the Debtors were continually forced to go
back to their current investors and lenders to obtain necessary funding, primarily Learn, which
the Debtors' repeatedly sought funding from.  In addition to the Debtors repeated reliance on

Learn, the Debtors also obtained funding from CEA, 2HR, and Mr. Girn to meet extremely short-term operating requirements, including payroll and rent.

59.    Unfortunately, even with multiple short-term commitments from existing lenders and investors, the Debtors ran out of time and capital necessary to effectuate any transaction or reorganization that would have left the Schools under the Debtors' ownership.  Because of this, the Debtors focused their efforts on maintaining as many Schools as a going concern, whether owned by the Debtors, the Debtors' secured lenders, or other operators.  For a number of unprofitable Schools, the Debtors worked with their landlords to find new operators to ensure that employees remained employed and students and families could continue to depend on the Schools' continued operations.

## A.    Financial and Management Issues

### i.    Negative Financial Performance

60.    As outline in the chart below, the Debtors have experienced massive operating losses that significantly outpaced revenues – cumulating in operating losses of over $440 million in the past five years.[23]

| Fiscal Year Ending August | Operating Revenues | Operating Expenses | Loss from Operations |
|---|---|---|---|
| 2020 | $40,514,61 | $96,157,925 | $(55,643,310) |
| 2021 | $81,909,500 | $180,879,010 | $(98,969,510) |
| 2022 | $123,650,999 | $230,608,782 | $(106,957,783) |
| 2023 | $161,597,696 | $264,842,110 | $(103,244,414) |
| 2024 | $192,478,070 | $248,423,727 | $(55,495,657) |
| 2025 (through April 2025) | $140,256,616 | $165,069,516 | $(24,812,999) |

---

[23]    Recognizing the Debtors' inability to generate operating income, beginning in 2021, the Debtors' auditor began issuing audit opinions that emphasized the Debtors' history of recurring losses, negative working capital, and cash outflows from operations.  In the audit opinion for the year ending August 31, 2023, the Debtors' auditor issued a qualified opinion regarding the Debtors' ability to continue as a going concern

4936-2117-3325.7

| Fiscal Year Ending August | Operating Revenues | Operating Expenses | Loss from Operations |
|---|---|---|---|
| **Cumulative Loss from Operations** | | | **$(445,123,673)** |

61.     Indeed, in the fall of 2024, the Debtors operated several Schools that were incurring losses of over $50,000 per month. The Debtors had also committed to a large development pipeline that included over 20 additional campus openings, with projects generally expected to require $1,000,000 or more in future capital to reach breakeven for these planned openings.

62.     Exacerbating the School-level losses were the substantial monthly corporate G&A expenses in excess of $2,500,000. Given the fact that the Debtors' operations consumed significantly more cash than they generated, the Debtors undertook a number of restructuring initiatives to improve financial performance, to boost liquidity and right-size their businesses. Ultimately, those initiatives did not yield sufficient financial changes in the necessary timeframe to prevent the Foreclosures and avoid these Chapter 11 Cases.

**ii.     Board and Management Changes**

63.     Beginning in 2024 and continuing in 2025 the Debtors experienced significant changes with respect to their Board and management resulting from general disagreements over strategy, growth, capital raising, and leadership.   While certain Board directors wanted the Debtors to transition to a mature, stable, and profitable operators, other directors believed the best path forward was continuing the "hyper-growth" strategy that required significant capital to fund expansion.   This philosophical disagreement led to a number of changes of the Board and the Debtors' management, resulting in uncertainty regarding the Debtors' future.

### b.    Officer and Board Changes in 2025

64.    At the beginning of 2025, the Board consisted of: Mr. Girn, Greg Mauro ("**Mauro**"), Robert Hutter ("**Hutter**"), Zheng Yu Huang ("**Huang**"), Matthew Bateman ("**Bateman**"), Jack Chorowsky ("**Chorowsky**"), and myself.  Chorowsky served as the Board's independent director.  As at the beginning of 2025, Mr. Girn served as the Debtors' Chief Executive Officer and President and Ms. Girn served as the Debtors' General Counsel and Secretary.  This structure, however, was short-lived due to various resignations and other changes to the Board and officers.

65.    On January 31, 2024, Matthew Bateman resigned from the Board and was not replaced by another director.  On February 25, 2025, Mr. Girn and Ms. Girn resigned from all of their respective positions as officers and director of the Debtors.  The Board elected Mitch Michulka ("**Michulka**"), the Debtors' Chief Financial Officer, and Maris Mendes ("**Mendes**"), the Debtors' Chief Operations Officer, to serve as the Debtors' co-Chief Executive Officers.  On March 10, 2025, Chorowsky resigned from his position as independent director and his position remained unfilled until Kirshbaum's appointment.  On March 28, 2025, Mauro and Hutter resigned from the Board due to Learn's foreclosure and were not replaced.  On March 31, 2025, Huang resigned from the Board.  At Mr. Girn's direction, Mr. Girn appointed himself to serve as a director.  Mr. Girn then resigned from the Board again on April 4, 2025.

66.    On May 18, 2025, at Learn Capital's designation and Venn's approval, Kirshbaum was elected to serve as the Independent Director.  As of the Petition Date, the Board consists of myself and the Independent Director, with the Independent Director having authorized the filing of these Chapter 11 Cases.

67.     On May 31, 2025, Michulka and Mendes, along with certain of the Debtors' other corporate employees ceased employment for the Debtors and began working for GGE.[24]  As HGE did not have any elected officers, the Independent Director asked that I accept, on an interim basis, the delegation of the duties and powers of the President and Secretary for HGE. Effective June 1, 2025, the Independent Director appointed me to serve as HGE's Interim President and Secretary.

## B.     Failed Prepetition Initiatives to Boost Long-Term Viability

68.     While the Board and management issues created governance and strategic challenges, the primary cause of these Chapter 11 Cases is purely the Debtors' inability to obtain funding necessary to satisfy secured debt obligations and pay amounts owed in the ordinary course of business from continuing operations.  Based on their financial performance and operational issues, the Debtors' ability to continue tapping external sources for funding became unfeasible.  Without sources of capital and with continuing multi-million dollar monthly operating losses, the Debtors accelerated initiatives to lower costs and improve liquidity.  These changes, however, did not result in sufficient long-term financing and operational changes that could enable the Debtors to continue as a going concern.

### i.     Engagement of Investment Bankers

69.     In the past three years, the Debtors pursued various financing, transactional, and restructuring opportunities through the engagement of three different investment bankers and marketing efforts led by the Board and Mr. Girn.  The Debtors engaged Barclays Capital Inc. ("**Barclays**"), Rothschild & Co US Inc. ("**Rothschild**"), and SC&H Capital ("**SC&H**"), as investment bankers, to pursue various opportunities for the Debtors, including, among other

---

[24]   Michulka, Mendes, and the other corporate employees – who are now employed by GGE – are performing work for the Debtors pursuant to a Management Services Agreement, effective as of June 1, 2025, between GGE and HGE.

things, recapitalization of existing debt; the sale of debt and/or equity instruments; the entry into new debt financing arrangements; a potential sale, merger, or other business and/or strategic combination involving the Debtors.  In addition, Learn Capital utilized its relationships with other investment bankers to solicit engagement from potential investors and acquirors.

        a.      **2024 Capital Raise**

70.     Specifically, Rothschild was engaged in January 2024 to facilitate an equity raise that was focused on private equity firms (particularly groups with existing education platforms), late-stage growth equity investors, and hybrid capital investors.  Rothschild engaged 67 potential investors, which did not lead to any actionable results.

71.     Barclays was also retained in January 2024 to focus on new debt funding through outreach to a group of structured debt providers.  Barclays engaged 38 total potential investors, with six of those investors executing non-disclosure agreements ("**NDAs**").  Five of those parties then engaged in management meetings and two participated in follow up sessions with the Debtors and their advisors.

72.     No actionable results came from the Rothschild and Barclays engagement.  While these third parties provided generally positive feedback on the Debtors' brand and educational product, there were numerous cited concerns that prevented outside parties from investing, including, among other things: continuous negative cash flows and questionable path to profitability, excessive rent costs (as discussed below), large balance of debt on the balance sheet, high level costs of G&A expenses, and questions about the Debtors' management.  As no third-party financing was available, the Debtors completed an insider-led financing under the NPA.

b.      **2025 Capital Raise / Sale**

73.     In December 2024, the Debtors re-engaged Rothschild to pursue transactions for both controlling and minority equity investors.  Rothschild led the marketing process with outreach to 18 financial targets and nine strategic targets.  Further, Barclays continued to solicit potential private equity investors for the same opportunities.  From these efforts, only one party executed an NDA and no parties engaged in meaningful activities towards consummating an equity transaction.  These marketing efforts also did not bring any actionable results for the same reasons as the previous marketing efforts by Rothschild and Barclays.

74.     In February 2025, the Debtors then engaged SC&H to focus on a transaction for the sale of substantially all of the Debtors' assets, with a focus on strategic investors, financial sponsors with existing education platforms, and private equity.  SC&H was also tasked with seeking debtor-in-possession financing from parties that would serve as a plan sponsor or potential buyer under a section 363 sale under the Bankruptcy Code.  SC&H performed initial outreach to 89 financial buyers, 30 strategic buyers, and four high-net worth individuals / family offices.  Again, no actionable activity came from SC&H's efforts.

75.     While Barclays, Rothschild, and SC&H were performing their marketing efforts, certain members of the Debtors' Board also engaged in direct outreach to select strategic investors through personal relationships and/or prior investments in the Debtors.  Following market news that the Debtors were closing certain Schools, a number of strategic investors reached out directly to the Debtors regarding potential acquisition opportunities.

76.     For example, in late March 2025, one strategic investor provided a verbal indication of interest for the acquisition of all of the Debtors' schools in Arizona, Illinois, North Carolina, and Virginia for an amount well below WTI's secured debt on those assets.  On March 31, 2025 and after WTI's foreclosure on March 22, 2025, another strategic investor

31

provided a non-binding letter of intent to with a contingent purchase price subject to numerous adjustments that the Company did not find value constructive.

77.     Simply put, the Debtors performed numerous thorough marketing processes that yielded no results that the Debtors could pursue.  It was only when the Debtors' financial distress became more public that parties became interested.  Even then, the proposals received by those interested parties were at fire sale prices and/or with contingencies that raised serious concerns regarding the likelihood of a closing on a potential transaction.  Further, **no** party came forward with a proposal that was in excess of secured debt held by WTI or any of the other secured lenders.

### ii.    Rent Deferrals and Lease Amendments

78.     Other than payroll costs for School-based employees, the Debtors' main operating costs are the rental expenses (the "**Rent Costs**") associated with the Schools' leases (the "**Leases**"), which prior to the Foreclosures, had a weighted-average remaining lease term of approximately 16 years.  As of April 30, 2025, the Debtors had approximately $610,971,888 of long-term Lease liabilities.  Indeed, the Rent Costs were historically more than one-third of the Debtors' operating revenues.  For context, competitors in the early childcare education sector typically operate with Rent Costs at closer to 20% of Revenue. The Debtors high Rent Costs reflect: (a) many newer Schools that had not yet ramped to mature levels of operating revenue and  (ii) above-market rents, driven by lease incentives (*i.e.*, capital contributions from development partners offered in exchange for higher rents).

| Year Ending | Operating Revenues | Rent Costs | Percentage of Rent Costs to Operating Revenues |
|---|---|---|---|
| 2020 | $40,514,615 | $24,439,783 | 60.3% |
| 2021 | $81,909,500 | $40,115,318 | 48.9% |
| 2022 | $123,650,999 | $49,349,071 | 39.9% |

| Year Ending | Operating Revenues | Rent Costs | Percentage of Rent Costs to Operating Revenues |
|---|---|---|---|
| 2023 | $161,597,696 | $63,228,287 | 39.1% |
| 2024 | $192,478,070 | $72,096,019 | 37.5% |
| 2025 (through April 2025) | $140,256,616 | $53,879,753 | 38.4% |

79.     Recognizing the massive Rent Costs, payment obligations, and the remaining long-term Lease liabilities, the Board executed a unanimous written consent on July 26, 2024 to (a) immediately stop all rent payments for the Leases beginning in August 2024 and (b) direct the Debtors to engage their landlords for the purposes of negotiating a restructuring of the Lease-related payments (the "**Lease Restructuring**").  In September 2024, the Debtors engaged Keen-Summit Capital Partners LLC ("**Keen Summit**") to assist the Debtors with the Lease Restructuring.

80.     The Lease Restructuring was a comprehensive and multi-faceted approach that presented landlords multiple options for various amendments to the Leases, including, among other things, rent deferrals, rent abatement, extension of Lease terms, and application of amounts owed to the Debtors under the Lease (*i.e.*, TI budget, startup capital, etc…) towards the unpaid rent.   The Debtors' real estate team engaged over 100 landlords to pursue the Lease Restructuring, including the structuring of an entire CRM-like negotiations-management tool to track the various landlord negotiations.   The Lease Restructuring was a success in that the Debtors executed approximately 120 Lease amendments – representing the vast majority of the Debtors' Leases. Further, for those Leases that could not be amended to a financially satisfactory agreement, the Debtors worked with the landlords to transition operations to a new tenant.

81.     While the Lease Restructuring provided short-term benefits for the Debtors' cash flows, it ultimately was not sufficient to offset ongoing losses.  Even with the cash flow savings,

the Debtors were unable to achieve positive cash flow from operations. Further, the rent deferrals were only for a period of time with the deferred rent obligations becoming payable in September 2025 for continuing operations. For dozens of other campuses, including certain leases that modified pursuant to the Lease Restructuring, the Debtors have not been paying rent for months and are in default thereunder.

### iii.   Other Restructuring Efforts

82.   To attempt to find more time to effectuate an out-of-court restructuring, the Debtors also performed the following actions:

**a.**   School Closures - As a result of the Debtors' financial shortcomings and the inability to pay rent at certain Schools, the Debtors were forced to close over fifty (50) Schools in 2025 prior to the Petition Date. In addition to School closures, Debtors have worked with landlords to transfer as many campuses as possible to other operators in an effort to reduce damages for landlords and help ensure stability of childcare for communities.

**b.**   Corporate Reductions in Force – Prior to the Petition Date, the Debtors terminated a large number of corporate employees, reducing monthly G&A spend by over 50%.

**c.**   Retention of Restructuring Professionals – In the year leading up to these Chapter 11 Cases, the Debtors engaged Foley as restructuring counsel; three financial advisors, with Sierra Constellation Partners LLC ("**SCP**") remaining as the Debtors' financial advisors as of the Petition Date; and Kurtzman Carson Consultants, LLC dba Verita Global ("**Verita**") serving as the Debtors' claims and noticing agent and administrative agent for these Chapter 11 Cases.

## V.
## FORECLOSURES, ASSET SALES, AND POST-FORECLOSURE OPERATIONS

### A.   Loan Defaults and Foreclosures on Certain Assets

83.   As stated above, the Debtors owed a significant amount of secured debt that was collateralized by a number of the Debtors' assets, including, among other things, the Schools, intellectual property, training and teaching programing, and other assets. The Debtors were

simply unable to pay the required payments under the various secured debt obligations – whether they be monthly/quarterly interest payments or the payment of principal upon the term of the debt obligations.  As a result, numerous secured lenders declared events of default, pursued their statutory remedies, and executed the Foreclosures on the majority of the Debtors' assets.

84.    The Debtors analyzed and investigated potential alternatives to the Foreclosures, including, among other things, obtaining new funding to cure any defaults, negotiating delays to the Foreclosures, and potential transactions that would monetize certain assets.  None of these alternatives resulted in any actionable paths for the Debtors.  As noted above, the Debtors exhausted their numerous marketing efforts and no parties were interested in providing the Debtors with a significant cash infusion that would delay the Foreclosures.

85.    Therefore, the Debtors focused on the path that would: (a) keep as many employees with jobs, (b) allow for as many students and families to continue using the Schools, and (c) continue the Debtors' mission of providing the best Montessori education programming in the United States.  While the Debtors would have preferred to lead this path, the reality was that the Debtors were financially unable to continue operations for these Schools and delay the Foreclosures.  As such, the Debtors worked with their secured lenders and the Foreclosure Buyers (as defined herein) to ensure that Schools that were foreclosed upon were not impacted by the Foreclosures – ensuring that employees kept their jobs and students and families had Schools to attend.

### i.    WTI Default and Foreclosure

86.    On March 10, 2025, WTI sent the Debtors a Notice of Default under Loan Agreements (the "**WTI Default Notice**") whereby WTI notified the Debtors of defaults under the WTI Loan Documents related to, among other things, the Borrowers' failure to pay necessary principal and interest payments, which the Borrowers failed to pay on December 1, 2024 through

and including March 1, 2025.  As a result of the Default Notice, WTI accelerated all obligations and indebtedness under the WTI Loan Agreement and, as of March 10, 2025, requested immediate payment of $27,764,326.34, with $2,317,526.04 owed to Fund IX and $25,445,800.30 owed to Fund X (collectively, the "**WTI Cure Payment**").

87.    On March 11, 2025, WTI sent the Debtors and the NPA Collateral Agent a Notice of Notification of Disposition of Collateral advising the Debtors that WTI intended to sell all right, title and interest of the Debtors in and to the WTI Collateral in which WTI has first priority security interests in privately sometime after March 21, 2025.  The Debtors investigated options to find funding to pay the WTI Cure Payment and were unable to do so.  Specifically, the Debtors were unable to raise funding for the WTI Cure Payment because, among other things: (a) the Debtors' business was continuing to experience multi-million dollar monthly losses, (b) the Debtors already had a complex and large debt structure with multiple levels of secured debt on various assets, (c) the inclusion of EB-5 Investors and the LFI Profit Share that impacted potential profit distributions from the Debtors' operating assets, (d) the Debtors' failed Lease Restructurings and ongoing Rent Costs, and (e) the uncertainty resulting from officer resignations.

88.    As a result, on March 22, 2025, WTI foreclosed (the "**WTI Foreclosure**") on certain of the WTI Collateral (the "**WTI Foreclosed Assets**") and, pursuant to a private sale, sold the WTI Foreclosed Assets to GGE pursuant to that Foreclosure Sale Agreement dated March 22, 2025 (the "**WTI Sale Agreement**").  Pursuant to the WTI Sale Agreement, GGE provided consideration of $23,082,335.51 for the acquisition of the WTI Foreclosed Assets, including numerous schools and substantially all of the Debtors' intellectual property, pedagogy,

education and training programing, social media assets, and other assets necessary for the continual operations of the Schools.

89.     As WTI did not foreclose on all of the WTI Collateral, WTI maintains a perfected, secured claim against the WTI Borrowers in the amount of $4,680,970.83.

### ii.   Learn Capital Default and Foreclosure

90.     On March 28, 2025, Learn Fund XXXVII delivered a Default Notice (the "**Learn Fund XXXVII Default Notice**") stating that the Learn Borrowers were in default under the Learn Fund XXXVII Promissory Note and related security agreement due to WTI issuing the WTI Default Notice.   Learn Fund XXXVII declared the entire unpaid principal and accrued interest under the Learn Fund XXXVII Promissory Note due and payable in an amount not less than $3,820,194.52.   Also on March 28, 2025, Learn Fund XXXVII delivered to the Learn Borrowers, Yu Capital, and counsel to EB5AN a Notification of Disposition of Collateral advising the Debtors that Learn Fund XXXVII intended to sell right, title and interest of the Learn Borrowers in and to Learn Fund XXXVII Collateral in which Learn Fund XXXVII has a first priority security interest in privately sometime after April 7, 2025 (the "**Learn Fund XXXVII Disposition Sale**").

91.     Through subsequent Notifications of Disposition of Collateral, Learn Fund XXXVII extended the Learn Fund XXXVII Disposition Sale to April 17, 2025.   On April 17, 2025, Learn Fund XXXVII deliver a letter to Yu Capital and EB5AN providing an offer to sell the Learn Fund XXXVII Collateral, other than the LePort Emeryville School, for $3,513,465.21, plus accruing interest (the "**Learn Fund XXXVII Sale Offer**").   The Learn Fund XXXVII Sale Offer had a deadline of April 18, 2025.   Neither Yu Capital nor EB5AN pursued the Learn Fund XXXVII Sale Offer.   The Debtors investigated options to find funding to delay the Learn Fund XXXVII Disposition Sale and were unable to do so.   Following the WTI

Foreclosure, which (as referenced above) included the Debtors' intellectual property, pedagogy, education and training programing, social media assets, and other assets necessary for the continual operations of the Schools, there was uncertainty regarding the viability of the Learn Fund XXXVII Collateral – limiting the value of those assets to third parties.

92.     On April 23, 2025, Learn Fund XXXVII foreclosed certain of the Learn Fund XXXVII Collateral (the "**Learn Fund XXXVII Foreclosed Assets**") and, pursuant to a private sale, sold the Learn Fund XXXVII Foreclosed Assets to Cosmic Education Americas Limited ("**CEA**").   Learn Fund XXXVII maintains an unsecured claim against the Learn Borrowers in the approximate principal amount of $410,350.

### iii.   Yu Capital Default and Foreclosure

93.     Following the WTI Default Notice and the Learn Fund XXXVII Default Notice, Yu Capital and certain of its affiliates issued their own default notices and pursued a foreclosure and sale of their collateral.

#### a.     YuHGE A Foreclosure

94.     The term of the YuHGE A loan ended on June 30, 2024, at which time all outstanding principal amount and unpaid interest were due and payable in full.  Guidepost A did not pay the outstanding amount due and payable upon the term date and, on March 3, 2025, YuHGE A issued a Notice of Event of Default (the "**YuHGE A Default Notice**").   The YuHGE A Default Notice stated that if Guidepost A did not pay the YuHGE A Loan in full by March 10, 2025, YuHGE A would exercise its remedies.

95.     On March 31, 2025, YuHGE A issued of Notice of Events of Default, Acceleration of Loans and Public Auction of Collateral (the "**YuHGE A Foreclosure Notice**") whereby Yu Capital stated that Guidepost A failed to cure the known events of default under the YuHGE A Loan.  YuHGE A also declared that all principal and accrued and unpaid interest

under the YuHGE A Loan were immediately due and payable.  The YuHGE A Foreclosure Notice also stated that YuHGE A was going to hold a public auction to sell the YuHGE A Collateral on April 30, 2025, at 4:30 p.m. (prevailing Eastern Time) pursuant to section 9-610 of the UCC (the "**YuHGE A Auction**").  The YuHGE A Foreclosure Notice was provided to Learn Capital IV, Fund IX, Fund X, US Foods, Inc., and the U.S. Small Business Administration.

96.     The Debtors were unable to cure all defaults set forth in the YuHGE A Foreclosure Notice by the YuHGE A Auction.  At the YuHGE A Auction, TNC Schools LLC, as assignee for YuHGE A, submitted a credit bid in the aggregate amount of $1,000,000 and were determined to be the highest bid for the YuHGE A Collateral.

### b.     Yu Capital, YuFIC B, and NRTC Default Notices

97.     On March 3, 2025, Yu Capital issued a Notice of Event of Default (the "**Yu Capital Default Notice**") identifying an event of default related to Guidepost A's failure to make required monthly installment payments for February 2025.  The Yu Capital Default Notice stated that if Guidepost A did not cure the defaults under the Yu Capital Loan by March 10, 2025, Yu Capital would exercise its remedies.

98.     The term of the YuFIC B loan ended on June 5, 2021, at which time all outstanding principal amount and unpaid interest were due and payable in full.  Guidepost A did not pay the outstanding amount due and payable upon the term date and, on March 31, 2025, YuFIC B issued a Notice of Event of Default (the "**YuFIC B Default Notice**"). The YuFIC B Default Notice stated that if Guidepost A did not pay the YuFIC B Loan in full by April 8, 2025, YuFIC B would exercise its remedies.

99.     On April 11, 2025, NTRC issued a Notice of Event of Default (the "**NTRC Default Notice**") identifying an event of default related to Guidepost A's failure to make required quarterly installment payments on April 10, 2025.  The NTRC Default Notice stated

that if Guidepost A did not cure the defaults under the NTRC Loan by April 18, 2025, NTRC would exercise its remedies.

### c.    Yu Capital Foreclosure

100.    On March 31, 2025, Yu Capital issued a Notice of Events of Default, Acceleration of Loans and Public Auction of Collateral (the "**Yu Capital Foreclosure Notice**") whereby Yu Capital stated that Guidepost A failed to cure the known events of default under the Yu Capital Loan.  Yu Capital also declared that all principal and accrued and unpaid interest under the Yu Capital Loan were immediately due and payable.  The Yu Capital Foreclosure Notice also stated that Yu Capital was going to hold a public auction to sell the Yu Capital Collateral on April 29, 2025, at 11:00 a.m. (prevailing Central Time) pursuant to section 9-610 of the UCC (the "**Yu Capital Auction**").  The Yu Capital Foreclosure Notice was provided to the NPA Collateral Agent, Fund IX, Fund X, and US Foods, Inc.

101.    The Debtors were unable to cure all defaults set forth in the Yu Capital Foreclosure Notice by the Yu Capital Auction.  At the Yu Capital Auction, TNC Schools LLC, as assignee for NTRC and Yu FICB, submitted a credit bid in the aggregate amount of $5,000,000 and were determined to be the highest bid for the Yu Capital Collateral.  Specifically, NTRC submitted a credit bid of $4,000,000 to acquire the NTRC Collateral and YuFIC B submitted credit bid of $1,000,000 to acquire the YuFIC B Collateral.

102.    Following the Yu Capital Foreclosure, the Debtors still owe $6,257,503 on the various Yu Capital Loans, with (a) $289,833 owed to NTRC, (b) $1,182,387 owed to YuFIC B, (c) $57,424 owed to YuHGEA LLC, (d) $327,858 owed to Yu Capital, and (e) $2,200,000 owed to YuATI.  Because all of the collateral securing these obligations were foreclosed upon, the Debtors believe that the outstanding obligations are unsecured.

### B.     Sale of Certain Assets

103.    Following the Foreclosures and even with the ability to fund certain operations under the TSAs, the Debtors were still in need of immediate working capital to pay, among other things, rent and payroll for the Schools that were not foreclosed upon and were/are being wound down in an organized manner.   The Debtors' options were limited and resulted in the Debtors approaching Learn Capital and CEA for additional funding.

### i.     <u>Sale Directly to CEA</u>

104.    To obtain necessary funding, HGE, the subsidiaries listed thereto, and CEA entered into that Asset and Equity Purchase Agreement dated May 7, 2025 (the "**CEA Purchase Agreement**").   Pursuant to the CEA Purchase Agreement, the Debtors sold to CEA (a) the Williamsburg, South Naperville, Bradley Hills, Leadwood, and South Riding Schools, and (b) all equity interests owned by the Debtors in Prepared TT and HGE FIC J LLC[25] for the aggregate consideration of $1,200,000.

### ii.     <u>Sale Pursuant to Purchase Option</u>

105.    To be able to fund payroll costs on April 8, 2025, HGE and certain other Debtors issued a Secured Convertible Promissory Note in the amount of $2,200,000 to Learn Capital Fund XXXVII (the "**Purchase Option Note**"), secured by that Security Agreement, dated as of April 7, 2025.   The Purchase Option Note was secured by substantially all of the assets in the following Schools (the "**Purchase Option Notice Collateral**"):

| Borrower | School | Secured Amount |
|---|---|---|
| LePort Emeryville LLC | Guidepost Montessori at Emeryville | $2,060,000 |
| Guidepost Carmel LLC | Guidepost Montessori at Carmel | $20,000 |
| Guidepost Richardson LLC | Guidepost Montessori at Richardson | $20,000 |
| HGE FIC I LLC | Guidepost Montessori at Oak Brook | $20,000 |

---

[25]   Guidepost A owned a 49% interest HGE FIC J LLC, an entity that owns the Marlborough School.

| Borrower | School | Secured Amount |
|---|---|---|
| HGE FIC I LLC | Guidepost Montessori at Worthington | $20,000 |
| HGE FIC L LLC | Guidepost Montessori at Bridgewater | $20,000 |
| HGE FIC M LLC | Guidepost Montessori at Brasswood | $20,000 |
| HGE FIC Q LLC | Guidepost Montessori at Kentwood | $20,000 |

106.    The Purchase Option Note provided Learn Capital Fund XXXVII with the option to acquire the Purchase Option Notice Collateral upon a default under the Purchase Option Note or at any time Learn Capital Fund XXXVII wished to exercise the option (the "**Purchase Option**").  The purchase price for the Purchase Option Note Collateral was (a) the sum of the amount outstanding under the Purchase Option Note and (b) $2,300,000 (the "**Purchase Option Price**").  On May 8, 2025, (x) CEA acquired the Purchase Option Note pursuant to a Note Transfer Agreement, dated May 8, 2025, and (y) pursuant to that Asset and Equity Purchase Agreement, dated May 8, 2025, between HGE, the subsidiaries listed thereto, and CEA, CEA exercised the Purchase Option and paid the Purchase Option Price.  CEA did not acquire the Carmel School when it exercised the Purchase Option.

C.    **Post-Foreclosure Transition Services Agreements, Management Services Agreements, and the Debtors' Operations**

107.    Concurrently with the Foreclosures, the Debtors entered into transition services agreements (the "**TSAs**") with GGE, CEA, and TNC (the "**Foreclosure Buyers**").  As stated above, the Debtors could not stop the Foreclosures and wanted to make sure that operations for the foreclosed-upon Schools were not impacted by the Foreclosures – the Debtors' goal was to make sure that as many employees remained employed and students in the Schools, as possible.  As such, the Debtors worked with the Foreclosure Buyers to ensure that the foreclosed-upon Schools and the Schools acquired pursuant to the CEA Purchase Agreement and the Purchase

4936-2117-3325.7

Option would continue operating without any harm to the Schools' employees and students – maximizing value for all parties in interest.

108.    With this in mind and knowing that the Foreclosure Buyers required additional time to transfer all operations to themselves, the Debtors entered into three different TSAs, one with each of GGE, CEA, and TNC.  Pursuant to the TSAs, the Debtors have been administering various functions on behalf of the Foreclosure Buyers, including, among other things, the transfer of licenses, leases, student deposit processing, cash management systems, and employees (the "**Transition Services**").  In exchange for the performance of the Transition Services, the Foreclosure Buyers are required to make the Debtors' net-zero – meaning that the Foreclosure Buyers reimburse and pay the Debtors for all expenses related to the Schools that the Foreclosure Buyers acquired and their respective share of the Debtors overhead costs.  In performing the Transition Services, GGE and CEA also allowed the Debtors to utilize tuition receipts for the Schools GGE and CEA acquired to offset against the costs of the Transition Services.

109.    On June 1, 2025, substantially all of the Debtors' corporate employees ceased employment with the Debtors and began employment with GGE.  As a result, the Debtors no longer had the staffing necessary to perform the Transition Services for the benefit the Foreclosure Buyers.  Therefore, the TSAs with GGE, CEA, and TNC were terminated, effective June 1, 2025.  The Debtors will continue to work with the Foreclosure Buyers to transfer necessary executory contracts, unexpired leases, and other documents to the Foreclosure Buyers to assist the Foreclosure Buyers in the ongoing operations of the Schools.

110.    As the Debtors have ongoing operations and the need to perform several business functions, the Debtors and GGE entered into a Management Services Agreement, effective as of

June 1, 2025 (the "**MSA**").  The MSA is necessary for the Debtors to continue operating during the pendency of these Chapter 11 Cases and to continue utilizing several business functions, including, among others, financing and accounting, human resources, and real estate matters. The Debtors will compensate GGE for the reasonable costs of the services performed by GGE under the MSA.  Concurrently herewith, the Debtors filed a motion to assume the MSA to ensure that the Debtors operate in these Chapter 11 Cases effectively and efficiently.

## VI.
## THE RSA AND THESE CHAPTER 11 CASES

111.    The RSA contemplates that the Debtors, 2HR, GGE, the Girns, Yu Capital, and the Supporting RSA Parties will support these Chapter 11 Cases and confirmation of the Plan, substantially in the form attached as Exhibit A to the RSA.  At a high level, the Plan generally provides, among other things, for (a) the funding of $8 million dollars in new money to fund these Chapter 11 Cases and to fund plan recoveries to the Debtors' prepetition creditors; (b) the contribution by GGE of Curriculum Assets and the Guidepost Global IP License (each as defined in the Plan); (c) the transfer of the Designated EB-5 Entities (as defined in the Plan) by the Debtors to GGE; (d) the assignment of certain executory contracts and unexpired leases to GGE; (e) the treatment of holders of allowed claims in accordance with the Plan and the priority scheme established by the Bankruptcy Code; (e) the mutual release of all claims and causes of action by and among each of the RSA Supporting Parties; and (f) the reorganization of the Debtors by retiring, cancelling, extinguishing and/or discharging the Debtors' prepetition equity interests and issuing new equity interests in the reorganized debtor(s) to 2HR.

112.    Importantly, with the exception of a $500,000 payment being made to Mr. Girn on account of his Bridge CN-3 claims, the Plan provides that of the RSA Supporting Parties are waiving their rights to Plan distributions in an effort to ensure some recoveries for the Debtors'

unsecured creditors.  Notably, absent these concessions, unsecured creditors would receive no recovery under the Plan.

113.    The RSA provides the Debtors with a viable path forward and a framework to successfully exit these Chapter 11 Cases in a timely fashion with the support of a number of the Debtors' significant stakeholders.  The transactions contemplated by the RSA enable the Debtors to maximize value for all stakeholders, continue the employment of current and former employees at the Schools, and ensure that the students and families can continue to utilize and rely on the Schools that are contemplated to remain open.

114.    As stated above, the RSA provides for the infusion of up to $8 million of new money in the form of the DIP Facilities, which also includes a dollar-for-dollar roll-up of up to $2 million of the pre-petition bridge loans.  Any amounts not utilized under the DIP Facilities will be used to fund recoveries to the Debtor's prepetition creditors.  Further, the RSA and Plan contemplates the reorganization of the Debtors' businesses to allow for 2HR to acquire the Debtors for future operations.  This reorganization will right-size the Debtors' balance sheet and provide for 2HR to effectuate its educational mission through the reorganized debtors.

115.    The RSA presents the most cost-effect path to a timely emergence of these Chapter 11 Cases path to a timely emergency from chapter 11 through settlement and compromise.  The signing of the RSA was undertaken only after careful consideration by the Debtors and the Board.  Critically, the Debtors' obligations under the RSA remain subject to their fiduciary duties as debtors and debtors in possession to maximize the value of their estates. Based on the foregoing, the Debtors believes they have exercised reasonable business judgment in its decision to execute the RSA, and that such execution is in the best interest of all parties in interest.

# VII.
## OVERVIEW AND SUPPORT FOR THE FIRST DAY MOTIONS

116.     Contemporaneously herewith, it is my understanding that the Debtors have filed a

number of First Day Motions seeking orders granting various forms of relief intended to stabilize

their business operations, facilitate the efficient administration of these Chapter 11 Cases, and

expedite a swift and smooth plan process. In consulting with the Debtors' counsel and advisors,

including the Debtors' proposed financial advisor, SCP, it is my understanding and belief that the

relief sought in the First Day Motion is intended to be as narrowly tailored as possible under the

circumstances and allow the Debtors to achieve those goals under the careful supervision of the

Bankruptcy Court.  The First Day Motions include the following:

    **a.**     *Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* (the "**Joint Administration Motion**");

    **b.**     *Notice of Designation as Complex Chapter 11 Bankruptcy Case* (the "**Complex Case Notice**");

    **c.**     *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Serve a Consolidated List of Creditors, (II) Authorizing the Debtors to Redact Certain Personal Identification Information, (III) Approving the Form and Manner of Notifying Creditors of the Commencement of the Debtors' Chapter 11 Cases, and (IV) Granting Related Relief* (the "**Creditor Matrix and Bar Date Motion**");

    **d.**     *Debtors' Emergency Application for Entry of an Order (A) Authorizing the Employment and Retention of Verita as Claims, Noticing and Solicitation Agent and (B) Granting Related Relief* (the "**Verita Retention Application**");

    **e.**     *Debtors' Emergency Motion for Order Extending Time to File Schedules of Assets and Liabilities and Statements of Financial Affairs* (the "**Schedules Extension Motion**");

    **f.**     *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Continue to Operate Their Cash Management System and (II) Granting Related Relief* (the "**Cash Management Motion**");

    **g.**     *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Maintain and Administer Their Existing Customer Programs and Honor Certain*

*Prepetition Obligations Related Thereto and (II) Granting Related Relief* (the "**Customer Programs Motion**").

**h.**     *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continuing Their Insurance Policies and Honor Obligations in Respect Thereof, (B) Renew, Supplement, and Enter Into New Insurance Policies, and (C) Honor the Terms of Related Premium Financing Agreements and Pay Premiums Thereunder, and (II) Granting Related Relief* (the "**Insurance Motion**");

**i.**     *Debtors' Emergency Motion for Entry of an Order (I) Authorizing and Approving Procedures to Reject Executory Contracts and Unexpired Leases and (II) Granting Related Relief* (the "**Lease Rejection Procedures Motion**");

**j.**     *Debtors' Emergency Motion for Entry of an Order (I) Authorizing Debtors to Pay Certain Prepetition Claims of Foreign Vendors and (II) Granting Related Relief* (the "**Foreign Vendors Motion**");

**k.**     *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Payment of Certain Prepetition and Postpetition Taxes and Fees and (II) Granting Related Relief* (the "**Taxes Motion**"); and

**l.**     *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses, (B) Continue Employee Benefit Programs, and (II) Granting Related Relief* (this "**Wages Motion**").

117.     I am familiar with the content and substance contained in each First Day Motion and believe that the relief sought in each motion (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity and value, (b) constitutes a critical element in the Debtors achieving a successful reorganization, and (c) best serves the Debtors' estates and creditors' interests. I have reviewed each of the First Day Motions, and the facts set forth therein are true and correct to the best of my knowledge and are incorporated herein in their entirety by reference. If asked to testify as to the facts supporting each of the First Day Motions, I would testify to the facts as set forth in such motions. The First Day Motions can be divided into two (2) categories: Administrative and Operational, as follows.

**A.    Administrative Motions—the Joint Administration Motion, Complex Case Notice, Creditors' Matrix Motion, Schedules Extension Motion, Verita Retention Application, and Lease Rejection Procedures Motion**

118.    It is my understanding that these pleadings are designed to streamline the administration of the Debtors' Chapter 11 Cases by, among other things: (a) jointly administering the Debtors' bankruptcy cases into one case and granting related relief; (b) approving typical complex case treatment for these Chapter 11 Cases, including relief related to the filing of a master service list; (c) establishing a general bar date for the filing of claims by non-governmental parties and allowing the Debtors to redact confidential information of creditors; (d) extending the deadline by which the Debtors must file required Schedules and Statements of Financial Affairs by seven (7) days for a total of twenty-one (21) days from the Petition Date; (e) approving the retention of Verita as claims and noticing agent for the Debtors; and (f) (i) authorizing and approving procedures for the rejection of certain executory contracts (the "**Contracts**") and unexpired leases (the "**Leases**") and (ii) authorizing the abandonment of any *de minimis* equipment, furniture, and other personal property remaining in the premises of the Leases as of rejection date.

119.    It is my opinion that the relief sought in the Administrative Motions will streamline the administration of these Chapter 11 Cases through procedural consolidation, facilitate the noticing process to interested parties, reduce the administrative expenses ultimately incurred by the Debtors, and reduce confusion. It is my understanding that the Administrative Motions seek non-substantive relief that is routinely granted in larger chapter 11 cases in this District and that is necessary and appropriate under the circumstances.

**B.    Operational Motion—the Cash Management Motion.**

120.    It is my understanding that the Cash Management Motion seeks authority for the Debtors to continue using existing bank accounts at Wells Fargo and related relief. Specifically,

the Debtors seek entry of an order: (a) authorizing the Debtors to (i) continue to operate their Cash Management System, (ii) pay any prepetition or postpetition amounts outstanding on account of the Bank Fees, (iii) maintain existing Business Forms in the ordinary course of business, and (iv) continue to perform Intercompany Transactions consistent with historical practice, and (d) granting related relief all as more fully set forth in the Motion.

121.     In the ordinary course of business, the Debtors maintain an integrated, centralized cash management system (the "**Cash Management System**") comparable to the cash management systems used by similarly situated companies to manage the cash of operating units in a cost-effective, efficient manner. The Debtors use the Cash Management System in the ordinary course of business to collect, transfer, and distribute funds generated from their operations and to facilitate cash monitoring, forecasting, and reporting. The Cash Management System allows the Debtors to control funds, ensure cash availability for each operating entity, and reduce administrative costs by facilitating the movement of funds among multiple entities. The Debtors' treasury department, which is now maintained at GGE, maintains daily oversight over the Cash Management System and implements cash management controls for entering, processing, and releasing funds. The Debtors' accounting department, which is now maintained at GGE, regularly reconciles the Debtors' books and records to ensure that all transfers are accounted for properly.

122.     The Cash Management System is arranged and organized to monitor cash flows between and to centralize procurement for general administrative and operating expenses. The Cash Management System, however, generally reflects the Debtors' Cash Management System prior to the Foreclosures.  As such, there are certain aspects of the Cash Management System that may not be operational at the time of the Petition Date and/or shortly thereafter.

There are certain Bank Accounts that may no longer be operating as of the Petition Date, but the Debtors have not been able to close such Bank Accounts or transfer them to the Foreclosure Buyers. Thus, such Bank Accounts remain in the Cash Management System.

123. To minimize the disruption caused by these Chapter 11 Cases and to maximize the value of the Debtors' estates, the Debtors request authority, but not direction, to continue to utilize their existing Cash Management System during the pendency of these Chapter 11 Cases, subject to the terms described herein.

*124. Bank Accounts.* As of the Petition Date the Debtors' Cash Management System includes a total of thirty-six (36) bank accounts (each a "**Bank Account**" and collectively, the "**Bank Accounts**").[26] The Debtors routinely transfer money between the Bank Accounts (as described below in more detail) via transfers between Debtors as Intercompany Transfers (defined below) in order to help cover outgoing payments.

125. The Bank Accounts are held at Wells Fargo National Bank, N.A. (the "**Cash Management Bank**" or "**Wells Fargo**"), which is an authorized depository by the Office of the United States Trustee for the Northern District of Texas (the "**U.S. Trustee**"). The Bank Accounts can be divided into four primary categories, and are identified on **Exhibit B** attached to the Cash Management Motion, and further summarized below:

- *Main Operating Account*. The Debtors' main operating account ending in x3030 (the "**Main Operating Account**") acts as the nexus for Intercompany Transfers for all Bank Accounts, including those held by non-Debtor affiliates.

- *School Operating Accounts*. The Debtors maintain separate operating account for the School entities (collectively, the "**School Operating Accounts**"). These accounts receive tuition deposits directly from students' families and pays various operation expenses of for the Schools.

---

[26] This number includes only Bank Accounts owned by the Debtor entities. The Debtors' Cash Management System also includes five (5) additional bank accounts owned by non-Debtor Affiliates which are shown in the cash management schematic, attached hereto as **Exhibit C**.

4936-2117-3325.7

- ***Holding/Inactive Accounts***.   The Debtors maintain several separate holding accounts (collectively, the "**Inactive Accounts**"), which are dormant and inactive as of the Petition Date.

- ***Specific Disbursement Accounts***. The Debtors maintain two disbursements accounts that are each dedicated for a specific purpose: (1) a disbursement account that is solely for the purpose of paying for tenant improvements (the "**Construction Vendor Account**"); and (b) a disbursement account that is solely for the purpose of paying the health benefit providers (the "**Health Benefits Account**," together with the Construction Vendor Account, the "**Specific Disbursement Accounts**").   These Specific Disbursement Accounts are dormant as of the Petition Date.

126.   ***Description of Funds Processing.*** The Debtors' revenue is primarily generated through tuition payments from their students and families.  Tuition deposits are received into the School Operating Accounts either via check, electronic payment, or direct deposit. These funds then directly pay certain taxes, vendors, and certain payroll obligations and benefits for employees.[27] Excess funds in the School Operating Accounts are also transferred to the Main Operating Account.  Funds in the Main Operating Account are then transferred to other Debtors' and non-Debtor affiliates' Bank Accounts to assist with the Debtors' operations. For instance, the Main Operating Account will transfer certain funds to the international non-Debtor affiliates, as detailed in the Cash Management Schematic.  The Main Operating Account will also transfer funds to School Operating Accounts as needed.

127.   The Health Benefits Account ending in x2202 also receives funds from the Main Operating Account, which are then used then used to pay certain employee health benefit providers.  The Construction Vendor Account ending in x5723 receives funds from a landlord, which are then used to pay construction vendors for improvements on a lease on which the Debtors are tenants.

---

[27]   A more detailed description of the Debtors' payroll and benefits obligations are described in *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses, (B) Continue Employee Benefit Programs, and (II) Granting Related Relief,* filed contemporaneously herewith.

128. The Debtors also pay certain vendors via check, ACH, wire, or credit card from the Main Operating Account or one of the School Operating Accounts. Taxing authorities are either paid by check or electronic payment from the Debtors' Main Operating Account or one of the School Operating Accounts. Similarly, payroll obligations and benefits are either paid from the Main Operating Account or one of the School Operating Accounts by directly depositing the funds to the Debtors' payroll processor, BambooHR.

129. *Corporate Card Program.* The Debtors provide certain employees with corporate credit cards issued by Corpay (the "**Corporate Card Program**") for certain business expenses incurred in connection with their employment, including certain preapproved travel, business licenses, and miscellaneous fees and services (the "**Employee Expenses**"). Employees also use the cards to pay for miscellaneous operating expenses as needed (the "**Operating Expenses**" together with the Employee Expenses, the "**Business Expenses**"). The Corporate Card Program has been assumed by and is being operated by GGE and any remaining Business Expenses for the Remaining Schools under the Corporate Card Program will be processed by GGE and paid by the Debtors pursuant to the MSA.

130. As of the Petition Date, the Debtors have approximately seven (7) employees at the Remaining Schools with corporate credit cards under the Corporate Card Program. The corporate credit cards are tied to the Debtors' credit and the Debtors are responsible for any amounts charged to the corporate credit cards. In light of the Remaining Schools, the Debtors have very limited Business Expenses under the Corporate Card Program, and believe that any such outstanding obligations, if any, are immaterial.

131. The Business Expenses are ordinary course expenses that the Debtors' employees incur in performing their job functions. It is essential to the continued operation of the

Remaining Schools that the Debtors be permitted to continue to pay amounts accrued and outstanding on account of the Corporate Card Program and be permitted to continue the Corporate Card Program in the ordinary course solely with respect to the Remaining Schools.

132.   **Bank Fees.** The Debtors pay fees to the Cash Management Bank on a monthly basis incurred in connection with the Bank Accounts (the "**Bank Fees**"). The Bank Fees total approximately $20,000 per month. The Debtors owe approximately $10,000 as of the Petition Date, the Debtors seek authority, but not direction, to pay the prepetition Bank Fees and continue paying the Bank Fees in the ordinary course on a post-petition basis, consistent with historical practice.

133.   ***Continued Use of Existing Business Forms and Records.*** The Debtors seek a waiver of the requirement that they open a new set of books and records as of the Petition Date. Opening a new set of books and records would create unnecessary administrative burdens and hardship and would cause unnecessary expense, use of resources, and delay. The Debtors, in the ordinary course of their businesses, use many checks, invoices, stationary, and other business forms (collectively, the "**Business Forms**"). By virtue of the nature and scope of the businesses in which the Debtors are engaged and the numerous other parties with whom they deal, the Debtors need to use their existing Business Forms without alteration or change. Printing new business forms would take an undue amount of time and expense. Fulfillment of the requirement would likely delay the payment of post-petition claims and negatively affect operations and the value of the Debtors' estates. Accordingly, the Debtors request that the Court authorize them to continue using their existing Business Forms and to maintain their existing business records.

134.   ***Intercompany Transactions.*** In the ordinary course of business, the Debtors maintain business relationships with each other (the "**Intercompany Transactions**") that have

historically resulted in intercompany receivables and payables (collectively, the "**Intercompany Claims**"). The Debtors settle Intercompany Transactions as journal-entry receivables and payables, from time to time, to document transactions between the Debtors and certain of their non-Debtor affiliates. Historically, these Intercompany Transfers are initiated by approved staff members (the "**Cash Management Staff Members**"). Intercompany Transactions between the Debtors and domestic non-Debtor affiliates are made on a daily basis to cover ongoing operational expenses. These transfers are authorized by Cash Management Staff members.

135. Intercompany Transfers between the Main Operating Account and Bank Accounts held by foreign non-Debtor affiliates are made twice a month to cover certain operational expenses. Two authorized Cash Management Staff Members must approve these transfers. Once an Intercompany Transactions is complete, the Debtors then make appropriate credits and debits within their accounting system to reflect these Intercompany Transfers.

136. The Debtors anticipate that the Intercompany Transactions will continue postpetition in the ordinary course of business among for operations involving the Remaining Schools. Such transfers are an essential component of the Debtors' businesses and are necessary to maintain the efficiency of the Debtors' operations and centralized Cash Management System. Because the Debtors engaged in the Intercompany Transactions on a regular basis prepetition, the Debtors believe that they may continue the Intercompany Transactions in the ordinary course under section 363(c)(1) of the Bankruptcy Code, without court approval but subject to any requirements under the DIP Order and DIP Documents. Nonetheless, out of an abundance of caution, the Debtors seek express authority, but not direction, to continue engaging in the Intercompany Transactions in the ordinary course of business on a postpetition basis in a manner substantially consistent with the Debtors' past practice. Consistent with their prepetition

practice, the Debtors will maintain records of all transfers and will continue to ascertain, trace

and account for all of the Intercompany Transactions and comply with their requirements under

the DIP Order and DIP Documents.

137.    I believe that the relief requested in the Cash Management Motion is in the best

interests of the Debtors' estates, the creditors, and all other parties in interest and will enable the

Debtors to continue to operate the Schools in chapter 11 without disruption. Accordingly, on

behalf of the Debtors, I respectfully submit that the Cash Management Motion should be

approved.

**C.    Operational Motion—Customer Programs Motion.**

138.    Prior to the Petition Date, in the ordinary course of the Debtors' business and as is

customary in their industry, the Debtors required Students to pay a tuition deposit (the "**Tuition**

**Deposit**") to hold a spot for their attendance at one of the Debtors' Schools.  The Tuition Deposit

is applied to the last month of tuition or, if the Debtors are unable to offer the child a spot in a

School, refunded to the Student. This in turn funds the Debtors' educational programs and

practices which include flexible homeschooling and virtual programs. As of the Petition Date,

the Debtors believe they owe approximately $671,000 on account of Tuition Deposits.

139.    Parents of Students also have the option to prepay tuition at their discretion

(the "**Prepayment Deposits**," and together with the Tuition Deposits, the "**Deposits**"

or "**Deposit Programs**").  The Prepayment Deposits are credited to monthly tuition invoices; if

proper notice that they are withdrawing a Student from one of the Schools is given, any

Prepayment Deposit balance for unused tuition are historically refunded. All families are eligible

to participate in the Prepayment Deposits.  As of the Petition Date, the Debtors believe they owe

approximately $592,000 on account of Prepayment Deposits.

140.    It is my understanding that the Schools compete in highly competitive businesses and must regularly provide students educational programs similar to (or better than) those offered by competing educational providers. The Debtors have collected the Deposits as part of their ordinary course of business in order to provide stability for the Schools.  Any delay in honoring obligations to Students would severely and irreparably harm the Debtors' efforts to maximize value for the benefit of all parties in interest in these cases.  If the Debtors do not pay the Deposits, then there could be additional harm to the Debtors' business, potentially impacting jobs and Students that rely on the ongoing Schools.

141.    Accordingly, through the Customer Programs Motion, the Debtors seek authority to honor all prepetition obligations related to the Deposits and to continue to honor the Deposit Programs in the ordinary course of their businesses on a postpetition basis without disruption. For the avoidance of doubt, the Debtors do not seek to pay any prepetition Deposits to any Student in excess of the $3,800 priority deposit cap imposed by section 507(a)(7) of the Bankruptcy Code.

142.    I believe that the relief requested in the Customer Programs Motion is in the best interests of the Debtors' estates, the creditors, and all other parties in interest and will enable the Debtors to continue to operate the Schools in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Customer Programs Motion should be approved.

**D.      Operational Motion—Insurance Motion.**

1.       In the Debtors' current operational structure, the Debtors maintain eight (8) insurance policies (collectively, the "**Insurance Policies**," a schedule of which is attached as Exhibit B to the Insurance Motion, that are administered collectively as part of a program

(the "**Insurance Program**") by various third-party insurance carriers (collectively, the "**Insurance Carriers**").

2.      The Insurance Policies provide coverage for, among other things, commercial liability, excess liability, commercial property liability, general liability, professional / directors and officers liability, professional liability, blanket student accident policy, blanket travel accident, and workers compensation liability. The Insurance Policies are essential to the ongoing operation of the Debtors' remaining business operations.

3.      Due to the changes in the Debtors' operations, the Insurance Policies reflect operations through the anticipated pendency of these Chapter 11 Cases. Based on the scope of the Insurance Policies, the Debtors will be paying the full amount of the insurance premiums and are not financing the insurance premiums over a period of time. As of the Petition Date, the Debtors owe approximately $612,846 in insurance premiums for the Insurance Policies (the "**Outstanding Premiums**").  The Debtors seek authority to pay all prepetition amounts due and owing (if any) on account of the insurance premiums and to continue honoring all payment obligations under the Insurance Policies in the ordinary course of business to ensure uninterrupted coverage thereunder.

143.    Under certain Insurance Policies, the Debtors are required to pay various deductibles (the "**Insurance Deductibles**") or self-insured retentions (the "**Self-Insured Retentions**"). Generally, if a claim is made against the Insurance Policies that is subject to an Insurance Deductible, the applicable insurance carrier will administer the claim and make payments in connection therewith and then invoice the Debtors for any Insurance Deductibles. A Self-Insured Retention is the required portion of the insured claim to be paid or incurred by the Debtors before the insurance policy will be effected and is a condition precedent to coverage for

payment of the portion of a loss in excess of the Self-Insured Retentions. As of the Petition Date, the Debtors do not believe that there are any material prepetition obligations owed to Insurance Carriers relating to Insurance Deductibles or Self-Insured Retentions, but, out of an abundance of caution, the Debtors seek authority, but not direction, to satisfy any outstanding prepetition Insurance Deductibles and Self-Insured Retentions owed in connection with the Insurance Policies, and to continue to honor their obligations under the Insurance Policies as they come due in the ordinary course of business on a postpetition basis.

144. Further, I understand that the maintenance of the Insurance Program is essential to the preservation of the value of the Debtors' businesses and operations. In many instances, insurance coverage is required by the regulations, laws, credit agreements, and contracts that govern the Debtors' commercial activities, including the requirement by the U.S. Trustee that a debtor maintain adequate coverage given the circumstances of its chapter 11 case.

145. ***Debtors' Insurance Broker.*** The Marsh & McLennan Agency LLC (the "**Broker**") is retained by the Debtors to help manage, among other things, the Debtors' portfolios of risk. The Broker, among other things, (a) assists the Debtors in obtaining comprehensive insurance coverage for the Debtors' operations in a cost-effective manner, (b) manages renewal data, (c) markets the Insurance Policies, (d) provides all interactions with carriers including negotiating policy terms, provisions, and premiums, and (e) provides ongoing support throughout the applicable policy periods. The Broker collects commission payments for its services as part of the premiums paid on account of the Insurance Policies.

146. The Broker is typically paid a commission directly from the Insurance Carriers, although in some instances the Broker is paid a commission or brokerage fee directly at the time

4936-2117-3325.7

of a purchase or payment (collectively, the "**Broker Fees**"). As of the Petition Date, the Debtors

do not believe there are any amounts due or outstanding on account of the Broker Fees.

147.    As described above, I believe that the relief requested in the Insurance Motion is

in the best interests of the Debtors' estates, the creditors, and all other parties in interest and will

enable the Debtors to continue to operate the Schools in chapter 11 without disruption.

Accordingly, on behalf of the Debtors, I respectfully submit that the Insurance Motion should be

approved.

**E.    Operation Motion—Foreign Vendors Motion.**

148.    As of the Petition Date, the Debtors operate one Foreign School in Canada and

three (3) in Paris, France. The Debtors intend to transition the operations of the Foreign Schools

to new entities on or around June 30, 2025.  The Debtors, in transferring the Foreign Schools'

operations, believe that they will have prepetition amounts outstanding and owed to vendors and

other parties related to the Foreign Schools (the "**Foreign Vendors**").  Payment of the

outstanding balances to the Foreign Vendors (i.e., the Foreign School Claims) will allow for the

Debtors to cleanly cease all obligation at the Foreign Schools and ensure that the transition of the

Foreign Schools to the new operators is consummated—alleviating any potential long-term

obligations that may affect the Debtors.

149.    In addition to the potential risks related to the interference in the transition of

operations and obligations related to the Foreign Schools, without the assurance of payment,

the Foreign Vendors may also take swift action based on a mistaken belief that they are not

subject to the automatic stay provisions of section 362(a) of the Bankruptcy Code.  Although, as

a matter of law, the automatic stay applies to protect the Debtors' assets wherever they are

located in the world, attempting to enforce the Bankruptcy Code in foreign countries is often

challenging and will consume meaningful estate personnel and resources. Moreover, it is my

understanding that the automatic stay by itself would not protect assets of the Debtors' non-Debtor affiliates, which could remain at risk of seizure and setoff. Again, the Debtors have foreign affiliates in France and Canada, against which the Foreign Vendors also may take action.

150.   As such, the Debtors believe that the request to pay the Foreign Vendor Claims as requested herein is appropriate and warranted under the circumstances. *First*, the Debtors believe that paying the Foreign Vendors is critical to preserving the Debtors' estates and is necessary for a successful reorganization. Indeed, absent such payment, the Foreign Vendors could take adverse actions against the Debtors, their affiliates, and their property, thereby delaying (or preventing) the transition of Foreign Schools to the new operators. *Second*, and to that end, the Debtors believe payment of the Foreign Vendor Claims is essential to avoid irreparable harm to the Debtors' estates in the event the Debtors' efforts to transition current Foreign School operations to a new operator are scuttled—resulting in additional monies being paid by the Debtors' estates. Again, failure to pay the Foreign Vendors could result in adverse actions against the Debtors or their affiliates that could not be quickly or inexpensively remedied, such as by exercising self-help remedies in far-flung jurisdictions. The Debtors' failure to pay such suppliers could also jeopardize the financial viability of those Foreign Vendors themselves. *Third*, and finally, the Debtors submit that there is no practical or legal alternative by which they can deal with the Foreign Vendors other than by payment of the Foreign Vendor Claims.

151.   In sum, the amount of the Foreign Vendor Claims pales in comparison to the potential damage to the Debtors' businesses. Therefore, the Debtors and their stakeholders would benefit from the relief requested herein. The Debtors seek to pay the Foreign Vendor Claims in the ordinary course on such terms and conditions as are appropriate, in the Debtors' business judgment, to avoid disruptions in their businesses. Accordingly, the Debtors seek

authority, but not direction, to pay the Foreign Vendor Claims in an amount not to exceed $80,000.

152.    I believe that the relief requested in the Foreign Vendors Motion is in the best interests of the Debtors' estates, the creditors, and all other parties in interest and will enable the Debtors to orderly wind down and transition the Foreign Schools, without an impact on these Chapter 11 Cases. Accordingly, on behalf of the Debtors, I respectfully submit that the Foreign Vendors Motion should be approved.

**F.    Operational Motion—Taxes Motion.**

153.    The Debtors collect, withhold, and incur certain income taxes ("**Income Taxes**"), business property taxes ("**Property Taxes**"), and various other taxes and fees associated with operating their Schools ("**Other Taxes and Fees**," collectively the "**Taxes**").    The Debtors collect (as applicable) and remit the Taxes to various local, state, and federal taxing authorities, including those identified in the schedule attached as Exhibit B in the Taxes Motion (collectively, the "**Taxing Authorities**").    Taxes are remitted or paid by the Debtors through checks and electronic funds transfers that are processed through their banks and other financial institutions.

154.    The Debtors pay the Taxes to the Taxing Authorities on a periodic basis, remitting them monthly, quarterly, or annually depending on the nature, jurisdiction, and incurrence of a particular Tax or Fee. Through the Taxes Motion, the Debtors seek to pay approximately $140,000 in prepetition Taxes, representing certain unpaid Taxes and which accrued or were incurred prepetition and become due postpetition. Additionally, the Debtors request the authority to pay any Taxes that arise or accrue postpetition in the ordinary course of business, consistent with prepetition practices.

155.    The Taxes that the Debtors believe are owed as of the Petition Date are summarized as follows:

| Category | Description | Estimated Aggregate Amount Accrued as of the Petition Date | Amount Requested to Pay Through this Motion |
|---|---|---|---|
| Income Taxes | Taxes imposed on income at the State and Federal level. | $20,000 | $20,000 |
| Property Taxes | Ad Valorem Taxes incurred by the Debtors in various states. | $80,000 | $80,000 |
| Other Taxes and Fees | Taxes and fees required for the Debtors to operate their business, such certain excise taxes as well as business licenses and permits and other fees associated with conducting business. | $40,000 | $40,000 |
| **Total** | | **$140,000** | **$140,000** |

156.    ***Income Taxes.*** The Debtors are required to pay various state Income Taxes to continue operating their Schools in accordance with state and federal laws. The Debtors believe that as of the Petition Date, they will owe approximately $20,000 in Income Taxes, which will become due and payable postpetition. The Debtors seek authority, but not direction, to pay this amount, as well as to continue paying Income Taxes postpetition in the ordinary course of their business.

157.    ***Property Taxes.*** State and local laws in the jurisdictions where the Debtors operate generally grant Taxing Authorities the power to levy Property Taxes based on the assessed value of the Debtors' assets, goods, or services. To avoid the imposition of statutory liens on their personal property,

158.     Based on historical expenses for the Remaining Schools, the Debtors believe that, as of the Petition Date, they will owe approximately $80,000 in Property Taxes, but may incur additional Property Taxes, which will become due and payable, postpetition. The Debtors seek the authority to pay this amount, as well as to continue paying Property Taxes postpetition in the ordinary course of their business.  For the avoidance of doubt, the Debtors are not seeking to pay any Property Taxes that they are contractually obligated to pay under their leases, which such taxes are not owed to the Taxing Authorities.

159.     ***Other Taxes and Fees.*** In the ordinary course of business, the Debtors also pay various other taxes, such as certain excise taxes and franchise taxes, in connection with the operations of their Schools (collectively, the "**Other Taxes**").   In addition, the Debtor pay various business and licensing fees associated with conducting business in certain jurisdictions (the "**Fees**").   Those Fees may include fees and assessments for, among other things, business licenses, annual reports, and permits.   The Other Taxes and Fees are paid on a monthly, quarterly, or annual basis, depending on the requirements of the particular jurisdiction. The Debtors estimate that there is approximately $40,000 of Other Taxes that is accrued and unpaid as of the Petition Date.  The Debtors seek the authority to pay this amount as they become due as well as paying any other Fees postpetition as they become due in the ordinary course of their business.

160.     I believe that the relief requested in the Taxes Motion is in the best interests of the Debtors' estates, the creditors, and all other parties in interest and will enable the Debtors to continue to operate the Schools in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Taxes Motion should be approved.

G.    **Operational Motion—the Wages Motion.**

161.    Through the Wages Motion, the Debtors are (a) authorizing, *but not directing*, the Debtors to (i) pay prepetition wages, salaries, other compensation, and reimbursable expenses on account of the Workforce Programs (as defined herein) and (ii) continue to administer the Workforce Programs in the ordinary course of business, including payment of prepetition obligations related thereto; and (b) granting related relief.

162.    Prior to June 1, 2025, the Debtors employed a vast network of employees (the "**Workforce**"), with the Debtors employing approximately 1,848 Employees (collectively, the "**Employees**").[28] The Employees have shifted employment due to the Foreclosures.   On June 1, 2025, substantially all of the Debtors' Employees at the Foreclosed Assets (i.e., the foreclosed Schools) and the corporate workforce ceased employment at HGE and began employment at GGE (the "**GGE Employees**").

163.    The Debtors still maintain operations at seven (7) Schools that were not foreclosed upon (the "**Remaining Schools**"), with the Debtors employing 73 Employees (the "**Remaining Employees**") as of the Petition Date.  I believe the Debtors intend to operate the Remaining Schools through, at a minimum, the end of June 30, 2025, with certain of the Remaining Schools transitioning to new operators.  In addition to the Remaining Employees, the Debtors also contract with fourteen (14) independent contractors as of the Petition Date.

164.    While the GGE Employees are no longer employed by the Debtors, they are still performing a wide variety of functions that are critical to the administration of these Chapter 11 Cases and the Debtors' restructuring pursuant to the MSA.   These functions include the

---

[28]    The Employees are neither represented by a union nor employed pursuant to a collective bargaining agreement or similar agreement.

performance of the human resources function for the Debtors through the pendency of these Chapter 11 Cases.

165.    In the ordinary course of business, the Debtors (a) pay standard wage compensation and paid time off to their Workforce, (b) maintain reimbursement programs, and (c) maintain certain benefits for their Workforce (collectively, the "**Workforce Programs**"), as provided below. As of the Petition Date, the Debtors estimate the aggregate total amount outstanding on account of the Workforce Programs is approximately $238,941 (the "**Workforce Obligations**"). The Workforce Obligations consist of the following:

| Workforce Obligations | Estimated Prepetition Amount Outstanding Per Pay Period |
| --- | --- |
| Unpaid Wages | $214,000 |
| Independent Contractor Payments | $11,000 |
| Non-Insider Incentive Plans | $0 |
| Withholding and Deduction Obligations (i.e., Deductions) | $0 |
| Employee Reimbursements | $0 |
| Health Benefit Plans | $11,226 |
| FSA | $0 |
| HSA | $315 |
| 401K Plan (Principal) | $0 |
| Workers Compensation Obligations | $2,400 |
| **TOTAL** | **$238,941** |

166.    The Debtors do not have Employees who are owed prepetition amounts in excess of the $17,150 priority wage cap imposed by sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code.  Through this Motion, the Debtors are not seeking authority to pay any amounts in excess of such cap at this time. Subject to the Court's approval of the relief requested herein, the Debtors, through the MSA, intend to continue their prepetition Workforce Programs for the Remaining Employees in the ordinary course of business. I believe that without the continued

service and dedication of the Employees, it will be difficult, if not impossible, to operate the Debtors' businesses without interruption, and resulting prejudice to the Debtors' ability to maximize the value of their estates. Thus, to successfully accomplish the foregoing, to minimize the personal hardship that the Employees will suffer if prepetition employee-related obligations are not paid when due or as otherwise expected, and to maintain employee morale and a focused workforce during this critical time.

167. ***Compensation and Wage Obligations.*** Employees are paid semi-monthly in arrears on or around the tenth and twenty-fifth of each month. For example, the Debtors' most recent payroll was paid on June 10, 2025, and covered the pay period from May 16, 2025, through May 31, 2025. As of the Petition Date, the Debtors will have outstanding payroll obligations from June 1, 2025, to the Petition Date for the Remaining Employees (the "**June Stub Pay Period**"). The June Stub Pay Period, along with wages earned from the Petition Date to June 15, 2025, will be paid on June 25, 2025.[29] Therefore, as of the Petition Date, the Debtors will have amounts owed to the Remaining Employees for standard wages and payment of overtime to their non-exempt Employees[30] who work in excess of forty (40) hours in a workweek.

168. Concurrently with the transition of employment for the GGE Employees, GGE took over and assumed operations of the Debtors' historical human resources and payroll processing systems. Historically, the Debtors' payroll processing functions were performed by BambooHR dba Trax Payroll ("**Trax**"). The Debtors' internal human resources team managed

---

[29]    The Debtors' next payroll for the Remaining Employees will be paid on July 10, 2025 for the pay period of June 16, 2025 through June 30, 2025.

[30]    Non-Exempt employees are employees whose work is covered by the Fair Labor Standards Act (FLSA).

the payroll processing function with Trax.  As such, GGE will process the Debtors' payroll with Trax pursuant to the MSA and the Debtors will reimburse GGE for the related costs.

169.    ***Independent Contractors.*** Debtors employ independent contractors and substitutes who are not employees of the company and do not receive company benefits. As of the Petition Date, the Debtors estimate that they owe approximately $11,000 on account of accrued but unpaid services to their independent contractors.

170.    ***Non-Insider Incentive Plans.*** Historically and in order to encourage and reward outstanding performance, certain Employees may earn bonuses under various bonus programs (the "**Employee Incentive Programs**"). The Employee Incentive Programs included, among other, programs that provided incentives for referral of talented employees, enrollment-specific bonuses, financial-based bonuses, and operational-based bonuses.

171.    Effective June 1, 2025, GGE assumed the operation of the Employee Incentive Programs and the potential obligations thereunder.  As of the Petition Date, the Debtors do not believe that any obligations remain outstanding for the Remaining Employees under the Employee Incentive Obligations.   However, the Debtors request the authority, but not the direction, to pay any amounts owing to the Remaining Employees under the Employee Incentive Programs, subject to the limitations set forth in section 507(a) of the Bankruptcy Code.

172.    ***Expense Reimbursements***. In the ordinary course of their business, the Debtors reimbursed their Workforce for a variety of ordinary, necessary, and reasonable expenses that Employees incurred within the scope of their job duties. Such expenses include costs for travel, lodging, transportation, meals, classroom supplies, and other general business-related expenses. Employees are expected to use sound judgment when incurring business expenses for which they seek reimbursement. To be reimbursed, an Employee must submit his or her receipts to the

Debtors within two weeks of purchase, but no later than sixty (60) days after purchase for approval. If approved, the Debtors reimburse the Employee for the reimbursed business expenses through its payroll in the ordinary course of the Debtors' businesses. As of the Petition Date, the Debtors only have limited expense reimbursement obligations for the Remaining Employees and the Debtors do not believe that such amounts are immaterial.

173.    Again, on June 1, 2025, GGE assumed the reimbursement obligations for the GGE Employees.  As of the Petition Date, the Debtors only have limited expense reimbursement obligations for the Remaining Employees and the Debtors do not believe that such amounts are material.  Moreover, as of the Petition Date, the Debtors do not believe there are any outstanding expense reimbursements owed to Remaining Employes. By this Motion, the Debtors seek authority to pay the Remaining Employees' expense reimbursements and to continue the expense reimbursements in the ordinary course of the Debtors' business for the Remaining Employees.

174.    ***Withholding and Deduction Obligations.*** In the ordinary course of business, the Debtors process deductions from Employees' compensation for federal, state, and local income taxes, FICA, court-ordered garnishments, child support, and other pretax deductions payable pursuant to certain of the health, welfare, and retirement savings programs detailed herein (collectively, the "**Deductions**") and forwards those amounts to various third-party recipients, including federal, state, and local taxing authorities. Some Deductions are made from each paycheck, while other Deductions are made less frequently. As of the Petition Date, the Debtors do not believe there are any outstanding Deductions. The Debtors seek to continue remitting the Deductions postpetition in the ordinary course for the Remaining Employees.

175.    ***Paid Time Off, Vacation, and Sick Days.*** All full time Employees are entitled to paid time off ("**PTO**") that accrues on a monthly basis, which accounts for PTO, holidays,

vacation and sick days. The PTO policy for Employees depends on whether the employee is a regular or temporary worker, and the Debtors also provide Employees with additional paid medical, parental, or expanded family and medical leave.  Effective June 1, 2025, GGE assumed the PTO obligations for the GGE Employees.  The Debtors request authority, but not direction, to allow the Remaining Employees to continue to use their accrued and/or carried-over PTO in the ordinary course of the Debtors' businesses.  The Debtors also request authority, but not direction, to pay outstanding PTO obligations to the Remaining Employees upon the completion of their employment.

176.    ***Employee Benefits Program.*** The Debtors offered their Employees the ability to participate in a number of insurance and benefits programs, including, among other programs, medical, vision, dental, disability, life insurance, pet insurance, and other employee benefit plans (collectively, the "**Employee Benefits Programs**").   The Employee Benefits Programs were assumed by GGE on June 1, 2025 and the Remaining Employees continue to have access to the Employee Benefit Programs pursuant to the terms of the MSA.

177.    Failure to continue the Employee Benefits Program could cause the Remaining Employees to experience severe hardship. In light of the substantial benefit the Remaining Employees have provided and will continue to provide to the Debtors' estates, the Debtors wish to avoid imposing such a hardship. Accordingly, by this Motion, the Debtors seek authority, but not direction, to: (a) pay any unpaid amounts due with respect to the Employee Benefits Programs for the Remaining Employees; and (b) continue to provide their Employee Benefits Programs in the ordinary course during the administration of these Chapter 11 Cases for the Remaining Employees, as necessary. As the Petition Date, the Debtors estimate that they owe approximately $11,541 on account of the Employee Benefits Programs for the Remaining

Employees, all of which will come due within the first 21 days of these Chapter 11 Cases. The

Employee Benefits Programs are described in greater detail below.

178.    The Debtors offered eligible Employees basic medical, dental, and vision

insurance (collectively, the "**Health Benefit Plans**"). The Debtors pay monthly premiums for

medical, vision, and dental insurance through the third-party administrator, Personify.

Specifically, the Debtors provided the following:

> a.    Medical Plan: The Debtors' offer Employees and their families medical
> plans (collectively, the "**Medical Plans**") offered through Anthem c/o
> Personify Health ("**Anthem**"). The Medical Plans offered through Anthem
> include options such as PPO Plan and HDHP/HSA Plan.

> b.    Dental Plan: Additionally, the Debtors offer their Employees the option of
> participating in a dental plan (the "**Dental Plan**"), which is administered
> by MetLife. The Dental Plan offered through MetLife includes a high or
> low plan through a basic preferred provider organization ("**PPO**") that
> covers both in and out of office network care.

> c.    Vision Plan: In addition to the eye exam offered under the Medical Plans,
> the Debtors also offer their Regular Employees the option of participating
> in a vision plan (the "**Vision Plan**") administer by EyeMed. The Vision
> Plan only provides in-network care.

179.    As of June 1, 2025, GGE assumed the operations of the Health Benefit Plans and

the obligations thereunder for the GGE Employees.  The Debtors' Remaining Employees are still

included in the Health Benefit Plans and the Debtors will reimburse GGE for the costs specific to

the Remaining Employees.   As of the Petition Date, the Debtors estimate that they owe

approximately $11,226 on account of accrued but unpaid amounts for the Health Benefit Plans

related to the Remaining Employees.  The Debtors seek authority to remit amounts on account of

their Health Benefit Plans as they become due and to continue doing so postpetition in the

ordinary course for the Remaining Employees.

180.    ***Flexible Spending Accounts.*** The Debtors also provided their Employees who

participate in the Medical Plans with access to a flexible spending account (the "**FSA**"),

administered by Better Business Planning Administration ("**Better Business**"). The FSA allows qualified Employees with the opportunity to contribute pre-tax dollars for eligible healthcare and/or dependent care expenses, depending on the participant's Medical Plans. The Debtors do not make any FSA contributions on behalf of the Employees.

181.    Since the Debtors' do not contribute to the Regular Employees' FSAs, the Debtors believe the FSA amounts are generally held in trust at Better Business and are not property of their estates. Employees utilized their FSA amounts through either a debit card at the point of purchase or the submission for reimbursement from Better Business after providing proof of purchase. Those amounts are paid by Better Business from the individual employee's FSA account.  All costs related to the FSAs are paid by the Employees who participate in the FSA program.  Effective June 1, 2025, GGE assumed the Debtors' FSA program and all Remaining Employees who participate in the FSA program will have access to continue making FSA contributions pursuant to the MSA.

182.    As of the Petition Date, the Debtors do not believe there are any outstanding amounts to remit on account of the FSA with respect to the Remaining Employees. By this Motion, the Debtors seek authority, but not direction, pursuant to the Order to continue the FSA in the ordinary course of business on a postpetition basis solely with respect to the Remaining Employees.

183.    ***Health Saving Accounts.*** For qualified Employees who participate in a high deductible health plan ("**HDHP**"), the Debtors offered access to a health savings account (the "**HSA**") through Better Business. Participating employees can opt to make pre-tax contributions to their individual HSA through payroll deductions to cover reimbursements under the program up to one-twelfth of the applicable maximum contribution set by the IRS – the limit amount

depends on whether the employee has an individual or family HDHP. The Debtors contribute a total amount of $840 annually ($35 per pay period) to each employees HSA. The Employees who participate in the HSA program pay any fees under the HSA program from their accounts. On June 1, 2025, GGE assumed all operations for the HSA program and all HSA obligations for the GGE Employees.

184.   As of the Petition Date, the Debtors believe they owe approximately $315 in unremitted HSA amounts to the Remaining Employees (collectively, the "**HSA Amounts**"), all of which becomes due within 21 days of the Petition Date. Pursuant to the Order, the Debtors seek authority, but not direction, to pay and/or remit the HSA Amounts and to continue the HSA, including the Company HSA Contributions, in the ordinary course of business on a postpetition basis solely for the Remaining Employees.

185.   ***Retirement Savings Plan.*** The Debtors provided all full-time Employees with the ability to participate in a 401(k) program (the "**401(k) Plan**"). The 401(k) Plan generally provides for pretax salary deductions of compensation up to limits set by the Internal Revenue Code, and an Employee's 401(k) contributions are deducted automatically from his or her wages. The Debtors do not make matching contributions. The 401(k) Plan was administered by the Debtors and, effective June 1, 2025, GGE assumed all operations for the 401(k) Plan and became the official plan sponsor.   After GGE become the plan sponsor for the 401(k) Plan, the Remaining Employees were no longer eligible to participate in the 401(k) Plan.

186.   As of the Petition Date, the Debtors estimate they owe approximately $6,000 on account of accrued but unpaid amounts for the 401(k) Plan for the Remaining Employees (the "**401(k) Plan Obligations**"), all of which will become due within 21 days of the Petition Date.   The Debtors request the authority, but not the direction, to remit amounts on account of

the 401(k) Plan as they become due and to continue doing so postpetition in the ordinary course, solely with respect to the Remaining Employees.

187. **_Other Workforce Benefits._** The Debtors offer tuition discounts to their full-time employees (the "**Tuition Discount**"). All School leadership (e.g., heads of Schools, assistant head of school, administrative director, program director, admissions director, etc.) receive a 100% tuition discount, while other full-time employees receive a 75% tuition discount. The tuition discount applies for up to two children and is only applied to the base tuition cost. The Debtors request the authorization, but not the obligation, to continue the Tuition Discount program for the Remaining Employees in the ordinary course of business.

188. **_Workers' Compensation._** The Debtors maintain workers' compensation insurance for Employees at the levels statutorily required by law for claims arising from or related to their employment with the Debtors (collectively, the "**Workers' Compensation Program**," and any obligations thereto, the "**Workers' Compensation Obligations**"). The Debtors maintain the Workers' Compensation Program through The Hartford. As of the Petition Date, the Debtors have approximately $2,400 in prepetition premiums outstanding for the Workers' Compensation Program, all of which will become due within 21 days of the Petition Date. As such, by this Motion, the Debtors seek the authority to remit amounts on account of the Workers' Compensation Program as they become due and to continue honoring their obligations with respect to the Workers' Compensation Program in the ordinary course of business. It is critical that the Debtors be permitted to continue their Workers' Compensation Program and to pay outstanding claims, taxes, charges, assessments, premiums, and third-party administrator fees in the ordinary course of business because alternative arrangements for workers' compensation

coverage would most certainly be more costly, and the failure to provide coverage may subject the Debtors and/or their officers to severe penalties.

189.    I believe that the relief requested in the Wages Motion is in the best interests of the Debtors' estates, the creditors, and all other parties in interest and will enable the Debtors to continue to operate the Schools in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Wages Motion should be approved.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

DATED:  June 18, 2025                    */s/ Jonathan McCarthy*
                                          Jonathan McCarthy

**<u>Exhibit A</u>**

**Org Chart**

Debtors
Non-Debtors
Higher Ground Education, Inc.
International Operations
HGE Canada Holdings ULC
Higher Ground Education France
Guidepost Montessori Canada ULC
Guidepost France A
Higher Ground Education Austria GmbH
Guidepost Prospera A LLC
Higher Ground Education Spain Sociedad Limitada
Higher Ground Education UK Limited
Training Operations
Prepared Montessorian LLC
Terra Firma Services LLC
Guidepost at Home
U.S. School Operations
Guidepost A LLC
Guidepost Birmingham LLC
Guidepost Bradley Hills LLC
Guidepost Branchburg LLC
Guidepost Carmel LLC
Guidepost FIC B LLC
Guidepost FIC C LLC
Guidepost Goodyear LLC
Guidepost Las Colinas LLC
Guidepost Leawood LLC
Guidepost Muirfield Village LLC
Guidepost Richardson LLC
Guidepost South Riding LLC
Guidepost St. Robert LLC
Guidepost The Woodlands LLC
Guidepost Walled Lake LLC
HGE FIC D LLC
HGE FIC E LLC
HGE FIC F LLC
HGE FIC G LLC
HGE FIC H LLC
HGE FIC I LLC
HGE FIC K LLC
HGE FIC L LLC
HGE FIC M LLC
HGE FIC N LLC
HGE FIC O LLC
HGE FIC P LLC
HGE FIC R LLC
LePort Emeryville LLC
AltSchool II LLC
Guidepost Prosperity LLC
Guidepost Williamsburg LLC
Guidepost South Naperville LLC

